**JOHNSTON, Admr.**

v.

**JOHNSTON et al**█

█ 2001-Ohio-4387.]

Court of Common Pleas of Ohio,
Lake County.

No. 00 CV 001494.

Decided Oct. 25, 2001.

148

Clifford C. Masch and Robert D. Warner, for plaintiff.

Joseph R. Tira, for defendant Daniel Johnston.

J. Stephen Teetor and Samuel H. Simon, for defendant G.R. Osterland Co.

Michael A. Paglia, for defendant Allstate Insurance Company.

Paul H. Eklund, for defendant Cincinnati Insurance Company.

Daniel Richards and Randy L. Taylor, for defendant Westfield Insurance Company.

---

EUGENE A. LUCCI, Judge.

{¶ 1} This matter came on to be heard on the following filings:

{¶ 2} 1. Plaintiff's motion for summary judgment and declaratory relief against defendants, Allstate Insurance Company ("Allstate"), Cincinnati Insurance Company ("Cincinnati"), and Westfield Insurance Company ("Westfield"), filed May 11, 2001;

{¶ 3} 2. Defendant Cincinnati's motion for summary judgment, filed May 14, 2001;

{¶ 4} 3. Defendant Cincinnati's memorandum contra plaintiff's motion for summary judgment, filed May 18, 2001;

{¶ 5} 4. Defendant Allstate's brief in opposition to plaintiff's declaratory relief and motion[1] for summary judgment, filed May 24, 2001;

{¶ 6} 5. Defendant Westfield's motion to dismiss, or alternatively, combined brief in opposition to plaintiff's motion for summary judgment and cross-motion for summary judgment, filed May 29, 2001;

{¶ 7} 6. Plaintiff's reply brief in support of its motion for summary judgment and in opposition to motion for summary judgment filed by defendants Cincinnati, Westfield, and Allstate, filed June 6, 2001;

{¶ 8} 7. Defendant Westfield's brief in response to plaintiff's reply brief in support of its motion and in opposition to motion for summary judgment filed by Westfield, etc., filed June 15, 2001;

{¶ 9} 8. Defendant Allstate's reply brief to plaintiff's brief in opposition to defendant Allstate's motion for summary judgment, filed June 18, 2001;

{¶ 10} 9. Defendant G.R. Osterland Company's ("Osterland") motion for summary judgment, filed June 25, 2001; and

{¶ 11} 10. Plaintiff's brief in opposition to motion for summary judgment filed by defendant Osterland, filed June 16, 2001.

---

1. As discussed below, this document purports to be a brief in opposition to plaintiff's motion for summary judgment. However, subsequent filings by plaintiff and by Allstate have treated this document as if it included a motion for summary judgment by Allstate against plaintiff.

## PROCEDURAL HISTORY

{¶ 12} Plaintiff Kathleen Johnston, in her individual capacity and as the administrator of her son's estate, filed the complaint in this action on September 20, 2000. The complaint named the following defendants: (1) Daniel Johnston (plaintiff's husband and the father of the decedent), (2) Osterland, (3) Allstate, (4) Cincinnati, and (5) Westfield. Plaintiff alleges that on August 31, 1999, her 17–year–old son, David Johnston, was injured and killed in a single-vehicle motorcycle accident as a proximate result of the negligence of defendants Osterland and Daniel Johnston. In her "First Cause of Action," plaintiff asserts a negligence claim for the injuries to David Johnston. In her "Second Cause of Action," plaintiff asserts a negligence claim for plaintiff's loss of consortium. In her "Third Cause of Action," plaintiff asserts a wrongful death claim for the death of David Johnston. And in her "Fourth Cause of Action," plaintiff asserts a claim for declaratory judgment concerning the existence, scope, and extent of insurance coverage under the various primary and excess insurance policies[2] that allegedly provided uninsured/underinsured motorist and liability coverage.

{¶ 13} Specifically, with respect to the insurance coverage that existed at the time of the motor vehicle accident, plaintiff alleges:

{¶ 14} 1. Allstate issued an automobile liability insurance policy containing UM/UIM coverage to, among others, Kathleen Johnston and David Johnston; that Kathleen Johnston and/or David Johnston were insureds under the Allstate policy; and that the various claims of the plaintiffs substantially exceed the aggregate limits of the Allstate policy.

{¶ 15} 2. Cincinnati issued a commercial liability insurance policy containing UM/UIM coverage (Policy No. 0638871) and an umbrella policy providing UM/UIM coverage (Policy No. CCC 438115) to, among others, Kathleen Johnston and David Johnston; that Kathleen Johnston and David Johnston were insureds for purposes of UM/UIM coverage under the Cincinnati policies; that the Cincinnati policies will be deemed by operation of Ohio law to provide UM/UIM coverage up to the available limits of the policies; and that the various claims of the plaintiffs substantially exceed the aggregate limits of the Cincinnati policies; and

{¶ 16} 3. Westfield issued a commercial automobile liability insurance policy containing UM/UIM coverage (Policy No. CWP 3 557)[3] and an umbrella policy

---

2. In paragraphs 33 and 34 of the complaint, as well as in the demand, plaintiff erroneously refers to the Allstate policies as "State Farm" policies. It is apparent to the court that such references are typographical errors, and they will, therefore, be treated as references to Allstate's policies.

3. {¶ a} There appears to be some confusion in the plaintiff's pleadings regarding the Westfield policies. In paragraph 7 of the complaint, plaintiff alleges that the Westfield

(Policy No. CWP 3557 704) providing UM/UIM coverage to, among others, Kathleen Johnston and David Johnston; that Kathleen Johnston and David Johnston[4] were insureds under the Westfield Commercial Auto Policy; that the Westfield policies will be deemed by operation of Ohio law to provide UM/UIM coverage up to the available limits of the respective policies; and that the various claims of the plaintiffs substantially exceed the aggregate limits of the Westfield commercial policies.

{¶ 17} On March 30, 2001, plaintiff filed her first amended complaint, which added allegations that defendant Allstate had issued a homeowner's insurance policy containing UM/UIM coverage, and added "John Doe Corporation" as a party defendant. The amended complaint alleged that John Doe Corporation issued policies of insurance containing UM/UIM coverage to The Family Christian Bookstore, which employed plaintiff's decedent, David Johnston, on the date of the accident. The amended complaint further alleged that "Defendants [sic] Kathleen Johnston and David Johnston were insureds under John Doe Corporation insurance policies which provided UM/UIM coverage," and that the plaintiffs' claims substantially exceed the aggregate limits of John Doe Corporation policies.

{¶ 18} The defendants responded to the complaint as follows:

{¶ 19} 1. Allstate filed its answer and cross-claim[5] against defendant Osterland (for contribution and/or reimbursement) on December 4, 2000, admitting[6]

---

commercial automobile liability policy was "Policy No. CWP 3 557" and the Westfield umbrella policy was "Policy No. CWP 3557 704." However, in paragraph 9 of the complaint, plaintiff alleges that the Westfield commercial automobile liability policy was "Policy No. CWP 3 55 7 704" and that the Westfield umbrella policy was "Policy no. CWP 3 557 704"—policy numbers which, except for the spacing between the digits, are identical.

{¶ b} As noted below, it appears that Westfield issued only one policy (No. 3557704), and that the one policy included both primary and umbrella coverage provisions.

4. In paragraph 37 of the complaint, plaintiff refers to *"Defendants* Kathleen Johnston and David Johnston." (Emphasis added.) It is apparent to the court that this is a typographical error. Therefore, these references are deemed by the court to pertain to plaintiff and plaintiff's decedent, respectively.

5. Defendant Osterland filed its answer to Allstate's cross-claim on December 18, 2000.

6. Allstate's answer also admitted the following allegations made in the complaint: (1) defendant Daniel Johnston is a resident of Mentor, Ohio, and was the driver of a motor vehicle who negligently caused the injuries described in the complaint, (2) defendant Osterland is an Ohio corporation which was involved in a road construction project on Corduroy Road in Mentor, Ohio, on or about August 3 [sic], 1999, (3) the previously identified insurance policies were in force and effect on the date of the accident, (4) plaintiff's decedent was a passenger on the motorcycle driven by his father, Daniel Johnston, while heading north on Corduroy Road on the date of the accident and approached a portion of Corduroy Road that was under construction, (5) defendant Osterland had been retained to do the road construction and had

that it issued an automobile liability insurance policy containing UM/UIM coverage to Kathleen Johnston as the named insured, but denying that Daniel[7] Johnston is a named insured in the policy. Allstate denied the substance of the rest of the allegations against Allstate and set forth several affirmative defenses.[8] On April 12, 2001, Allstate filed a "separate answer of Allstate Insurance Company as it relates to the auto policy."

{¶ 20} 2. Cincinnati filed its answer and jury demand on October 23, 2000, denying the substance of the plaintiff's allegations against Cincinnati.[9] Cincinnati also raised the affirmative defense that the uninsured/underinsured motorist coverage was validly rejected with respect to Cincinnati Policy No. CCC 438 11 15. On April 12, 2001, Cincinnati filed its answer to plaintiff's first amended complaint in which it added the following affirmative defenses: (1) failure to join

---

begun work on the morning of August 31, 1999, and (6) the wrongful death claims are brought on behalf and for the exclusive benefit of the decedent's beneficiary next of kin.

7. Defendant Allstate appears to be responding to paragraph 5 of the complaint; however, in paragraph 5, plaintiff alleged that Allstate issued an automobile liability insurance policy containing UM/UIM coverage to, among others, Kathleen Johnston and *David* Johnston. Hence, Allstate's denial that *Daniel* Johnston was a named insured is inapposite.

8. Allstate's affirmative defenses were as follows: (1) the Allstate policy that was issued to Kathleen Johnston containing Policy No. 026272979 describes a vehicle other than the vehicle being operated by Daniel Johnston when the accident occurred, (2) failure to state a claim upon which relief may be granted, (3) express, implied, or primary assumption of the risk, (4) failure to join necessary and/or indispensable parties, (5) the injuries alleged by the plaintiff were the sole and proximate result of the negligence of a person other than Allstate, (6) failure of sufficient process or sufficient service of process, (7) contributory negligence, and (8) under the Allstate policy endorsement, "an uninsured auto is not a motor vehicle owned by, furnished to, or available for the regular use of the insured person, a spouse, or a resident relative of insured person."

9. Cincinnati's answer also admitted the following allegations made in the complaint: (1) Kathleen Johnston was the mother and legal guardian of David Johnston and is the duly appointed and acting administrator of the estate of David Johnston, (2) defendant Daniel Johnston is a resident of Mentor, Ohio, and was the driver of a motor vehicle who negligently caused the injuries described in the complaint, (3) defendant Osterland is an Ohio corporation which was involved in a road construction project on Corduroy Road in Mentor, Ohio, on or about August 3 [sic] 1999, (4) the previously identified insurance policies were in force and effect on the date of the accident, (5) plaintiff's decedent was a passenger on the motorcycle driven by his father, Daniel Johnston, while heading north on Corduroy Road on the date of the accident and approached a portion of Corduroy Road that was under construction, (6) defendant Osterland had ground down approximately three inches of the asphalt on a portion of the northbound lane of Corduroy Road, (7) as a direct and proximate result of the negligence of defendants Osterland and Daniel Johnston, plaintiff has suffered a loss of services and consortium of David Johnston, (8) the wrongful death claims are brought on behalf and for the exclusive benefit of the decedent's beneficiary next of kin, and (9) as a direct and proximate result of the negligence of Daniel Johnston, David Johnston came to his death on August 31, 1999.

necessary parties, (2) plaintiff is not an insured under the subject policy, and (3) the Cincinnati policy is excess over all other applicable insurance.

{¶ 21} 3. Westfield filed its answer, counterclaim for declaratory judgment, and cross-claim[10] for subrogation against defendant Daniel Johnston on November 17, 2000. In its answer, in addition to denying the substance of the plaintiff's allegations, Westfield stated that it issued a commercial general liability policy (Policy No. 3557704)[11] to Contour Tool, Inc. with Contour Tool, Inc. as the only named insured. The policy included umbrella coverage and UM/UIM coverage "subject to the terms, conditions, limitations, exclusions, and provisions of the policy." And even though Westfield admitted that the policy was in full force and effect on the date of the accident, Westfield specifically denied that the policy provided UM/UIM coverage for plaintiff's claims. A certified copy of the Westfield policy (No. 3557704) was labeled "appendix" and was attached to Westfield's answer, cross-claim, and counterclaim.[12] On May 16, 2001, Westfield filed its answer to plaintiff's first amended complaint (and reasserted its cross-claim against defendant Johnston[13] and its counterclaim for declaratory judgment), adding the affirmative defense that plaintiff was estopped from relying on the Ohio Supreme Court's decisions in *Scott–Pontzer, Ezawa, Wolfe,* and *Linko,*

---

**10.** Defendant Daniel Johnston filed his answer to Westfield's cross-claim on December 7, 2000.

**11.** It is apparent from Westfield's answer that—notwithstanding the confusion arising from the allegations in the complaint—Westfield issued one policy only, and the number of that policy was 3557704.

**12.** Westfield raised the affirmative defenses of (1) failure to state a claim upon which relief may be granted, (2) the limitations, terms, conditions, provisions, and exclusions of the Westfield policy, (3) failure to exhaust liability insurance and/or bonds of all persons liable to plaintiff, (4) contributory and/or comparative negligence, (5) assumption of the risk and primary assumption of the risk, (6) failure to join all necessary and indispensable parties, (7) failure of conditions precedent and/or conditions subsequent, (8) exclusion of UM/UIM coverage under the Westfield primary policy by R.C. 3937.18 and its conforming policy provisions which exclude coverage for bodily injury sustained by "any family member while occupying * * * any vehicle owned by you that is insured * * * on a primary basis under any other coverage form or policy," (9) exclusion of UM/UIM coverage under the Westfield policy where the vehicle was "owned by or furnished or available for your regular use or that of any family member," (10) neither Kathleen, David, nor Daniel Johnston were "insureds" under Westfield's umbrella policy because insureds are employees of Contour Tool, Inc. who are acting in the course and scope of employment, (11) if UM/UIM coverage exists, Westfield's policy provides only second tier UM/UIM coverage which is excess to any first tier or primary UM/UIM coverage, (12) Westfield is entitled to a setoff of all amounts for sums paid for bodily injury by or on behalf of anyone who is legally responsible, and (13) Westfield's liability, if any, is further reduced by all other available primary UM/UIM coverage and on a pro rata basis by any available excess UM/UIM coverage.

**13.** On May 21, 2001, defendant Johnston filed his answer to the cross-claim by defendant Westfield.

and their progeny, because "said decisions are unconstitutional in violation of (1) the right of freedom of contract under Ohio Const. Art. II, Section 28, and under U.S. Const. Art. I, Section 10, (2) procedural and substantive due process, (3) prohibitions against ex post facto and retrospective laws, (4) the regulatory takings provisions, (5) equal protection of the laws, and (6) other provisions of the Ohio and U.S. Constitutions."

{¶ 22} 4. Osterland filed its answer on October 27, 2000, denying each and every allegation in the plaintiff's complaint. On November 3, 2000, Osterland filed its amended answer[14] and cross-claim[15] against defendant Daniel Johnston for contribution and indemnification. On April 27, 2001, defendant Osterland filed its answer to the first amended complaint, together with Osterland's cross-claim[16] against defendant Daniel Johnston. Osterland's amended answer added an allegation in paragraph 4 asserting that defendant Daniel Johnston "drove his motorcycle left of center, across a double-yellow line, and was careless and negligent in his operation of that vehicle, thereby causing or contributing to cause said accident." Osterland's amended answer also asserted several affirmative defenses for the first time.[17]

{¶ 23} 5. Daniel Johnston filed his answer[18] on December 7, 2000, denying the

---

14. Osterland's amended answer admitted the following allegations: (1) that an accident occurred on or about August 31, 1999, on Corduroy Road in Mentor, Ohio, where defendant Daniel Johnston lost control of his motorcycle, (2) Daniel Johnston's 17–year–old son was riding as a passenger on the motorcycle without a helmet, was injured, and subsequently died, (3) Kathleen Johnston was the mother and legal guardian of David Johnston and is the duly appointed and acting administrator of the estate of David Johnston, (4) defendant Daniel Johnston is a resident of Mentor, Ohio, and was the driver of a motor vehicle who negligently caused the injuries described in the complaint, (5) defendant Osterland is an Ohio corporation which was involved in a road construction project on Corduroy Road in Mentor, Ohio, on or about August 31, 1999, (6) defendant Osterland had been retained by the city of Mentor to perform certain services with respect to the roadway and that, pursuant to its contract, Osterland had removed portions of the asphalt from the roadway and properly marked the roadway and warned motorists of the construction.

15. Defendant Johnston filed an answer to defendant Osterland's cross-claim on May 3, 2001.

16. Although not named in defendant Osterland's cross-claim, defendant Westfield nonetheless filed an answer to Osterland's cross-claim on June 25, 2001.

17. Osterland's affirmative defenses were (1) failure to state a claim upon which relief may be granted, (2) failure of service or service of process, (3) failure to join necessary or indispensable parties, (4) comparative or contributory negligence, (5) decedent's failure to wear a helmet while riding on a motorcycle, (6) assumption of the risk, (7) unforeseeable, superseding, and intervening causes, and (8) immunity under R.C. Chapter 2744.

18. Defendant Daniel Johnston admitted the following facts: (1) plaintiff was the mother and a legal guardian of David Johnston, (2) plaintiff was the duly appointed and acting administrator of the estate of David Johnston, (3) defendant Daniel Johnston is a resident of Mentor, Ohio, and was the driver of a motor vehicle which was involved in an accident, (4) defendant

substance of the allegations against him.[19] Together with his answer, Daniel Johnston also filed his cross-claim[20] against Osterland (for contribution as a joint tortfeasor). On April 17, 2001, defendant Johnston filed his answer to the first amended complaint, and renewed his cross-claim[21] against defendant Osterland.

## SUMMARY JUDGMENT

{¶ 24} Civ.R. 56(C) states:

Osterland was negligent in creating a substantial hazard to the public and in its failure to adequately warn the public as to the hazardous status of the road during the course of the road construction project, (5) on or about August 31, 1999, plaintiff's decedent, David Johnston, was a passenger on a 1993 Honda Gold Wing motorcycle operated by his father, defendant Daniel Johnston, heading north on Corduroy Road in Mentor, Ohio, (6) as they were traveling north on Corduroy Road, defendant Daniel Johnston approached a portion of Corduroy Road which was under construction, (7) defendant Osterland had been retained to do the road construction and had begun work on the morning of August 31, 1999, (8) defendant Osterland had ground down approximately 3 inches of the asphalt on a portion of the northbound lane of Corduroy Road, (9) defendant Osterland negligently allowed the general public to transverse the portion of Corduroy Road despite its hazardous condition, (10) defendant Osterland failed to warn the traveling public as to the hazardous condition of Corduroy Road in a manner which would reasonably enable the public to safely traverse the road, (11) defendant Daniel Johnston attempted to move to his left on Corduroy Road and defendant Osterland created a hazardous condition on the road due to its construction activities, (12) defendant Daniel Johnston lost control of his motorcycle as a direct and proximate result of the hazardous condition created in the roadway by the construction work of defendant Osterland, and the tires of his motorcycle made contact with a three-inch lip in the road surface created by defendant Osterland, (13) David Johnston died as a result of injuries suffered in the accident, (14) as a direct and proximate cause of the negligence of defendant Osterland, David Johnston sustained pain, suffering, disability, and incurred hospital and medical expenses, (15) as a direct and proximate result of negligence of defendant Osterland, David Johnston wrongfully came to his death on August 31, 1999, and his beneficiaries incurred pecuniary loss, including but not limited to funeral and burial expenses, and (16) defendant Osterland was negligent.

**19.** Defendant Johnston's answer also raised the following affirmative defenses: (1) failure to state a claim upon which relief may be granted, (2) the injuries and damages complained of were the direct and proximate result of the sole negligence of defendant Osterland, (3) the injuries and damages complained of were the direct and proximate result of the intervening and superseding negligence of defendant Osterland, (4) the injuries and damages complained of were the direct and proximate result of the sole negligence of third parties, (5) the injuries and damages complained of were the direct and proximate result of the intervening and superseding negligence of third parties, (6) recovery is barred by the doctrine of sudden emergency, (7) failure to join parties under Civ.R. 19 and 19.1, (7) possible failure to mitigate damages, (8) lack of personal jurisdiction over the answering defendant, and (9) insufficiency of service of process and insufficiency of service.

**20.** Defendant Osterland filed its answer to defendant Daniel Johnston's cross-claim on December 18, 2000.

**21.** Defendant Osterland filed its answer to defendant Daniel Johnston's cross-claim on April 27, 2001.

{¶ 25} "Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor."

{¶ 26} Thus, before summary judgment may be granted, it must be determined that (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made.[22]

{¶ 27} The main purpose of the summary judgment procedure is to enable a party to go behind the allegations in the pleadings and assess the proof in order to see whether there is a genuine need for trial. The remedy should be applied sparingly and only in those cases where the justice of its application is unusually clear. Resolving issues of credibility or reconciling ambiguities and conflicts in witness testimony is outside the province of a summary judgment.[23] In reviewing a motion for summary judgment, the court must construe the evidence and all reasonable inferences drawn therefrom in a light most favorable to the party opposing the motion.[24]

{¶ 28} Under Ohio law, for purposes of ruling on a motion for summary judgment, a dispute of fact is "material" if it affects the outcome of the litigation. The dispute is "genuine" if it is manifested by substantial evidence going beyond the mere allegations of the complaint.[25]

---

22. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267; *Mootispaw v. Eckstein* (1996), 76 Ohio St.3d 383, 667 N.E.2d 1197.

23. *Napier v. Brown* (1985), 24 Ohio App.3d 12, 24 OBR 33, 492 N.E.2d 847.

24. *Morris v. Ohio Cas. Ins. Co.* (1988), 35 Ohio St.3d 45, 517 N.E.2d 904; *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46.

25. *Mount v. Columbus & S. Elec. Co.* (1987), 39 Ohio App.3d 1, 528 N.E.2d 1262.

## DISPOSITIVE MOTIONS

### 1. The Allstate Policy

{¶ 29} On May 11, 2001, plaintiff filed her motion for summary judgment against Allstate, Cincinnati, and Westfield, in which she made the following arguments "solely for the purposes of having this Court determine, as a matter of law, the availability of UM/UIM coverage under policies of insurance as it relates to the claims of Kathleen Johnston and Daniel[26] Johnston." (Footnote added.)

### A. Plaintiff's Motion for Summary Judgment Against Allstate

#### i. Arguments of the Parties

{¶ 30} With respect to Allstate Policy No. 0 26 272979, plaintiff argues that the policy provides UM/UIM coverage—over and above the limits of $25,000 under Daniel Johnston's liability policy issued by Progressive Insurance—with UM/UIM limits of $100,000 each person/$300,000 each accident.[27] Citing *Moore v. State Auto Mut. Ins. Co.*,[28] plaintiff argues that the claims of "Kathleen and Daniel[29] Johnston" under the Allstate policy meet the four criteria for coverage: (1) that the claimant is insured under the subject policy, (2) that the claimant is legally entitled to recover damages from the uninsured/underinsured motorist, (3) that the damages arise from injury, sickness, or death, and (4) that the tortfeasor is an owner or operator of an uninsured or underinsured vehicle.[30]

---

**26.** The court is unaware of any claim in this action brought by *Daniel* Johnston, who was the driver of the motorcycle and the father of plaintiff's decedent. It is, therefore, assumed that this reference should have read "David" Johnston.

**27.** On page 7 of her brief, plaintiff asserts that "this Court must determine the existence of $1,000,000 of coverage under the Allstate Policy." Since the Allstate policy carries limits of $100,000/$300,000, it is unclear how the plaintiff arrived at this figure.

**28.** *Moore v. State Auto. Mut. Ins. Co* (2000), 88 Ohio St.3d 27, 31–32, 723 N.E.2d 97 (Douglas, Brogan, F.E. Sweeney and Pfeifer, JJ., concurring; Brogan, J., of the Second Appellate District, sitting for Resnick, J.)

**29.** Again, the court is unaware of any claim brought in this action by *Daniel* Johnston.

**30.** Although plaintiff's list of four criteria accurately describes some of the salient facts in *Moore*, the *Moore* decision stands for a very precise proposition of law. In *Moore*, the Supreme Court held that the rule announced in *Sexton v. State Farm Mut. Ins. Co.* (1982), 69 Ohio St.2d 431, 23 O.O.3d 385, 433 N.E.2d 555 (policy limitation requiring that an insured must sustain bodily injury in order to recover for damages caused by uninsured motorist was void because it attempted to limit recovery contrary to the requirements of R.C. 3937.18) was not superseded by the General Assembly's enactment of Am.Sub.S.B. No. 20 (effective 10-20-1994). Therefore, State Farm's policy limitation—which similarly sought to limit such recovery to insureds who sustain bodily injury, and which was governed by S.B. 20—was void for the same reason. In the present case, however, R.C. 3937.18(A)(1) was amended again by Am.Sub.H.B. No. 261 (effective 9-3-1997). H.B. 261 changed some of the very statutory

{¶ 31} In its brief in opposition (filed May 24, 2001), defendant Allstate argues that (1) the motorcycle involved in the accident was not insured by Allstate, (2) the Allstate policy has clear and unambiguous language that excludes both uninsured/underinsured motorist coverage and coverage for accidents involving a single vehicle, (3) plaintiff and defendant Daniel Johnston admit that they purchased a Progressive insurance policy to cover the motorcycle involved in the accident, and (4) the Allstate auto insurance policies covered two other vehicles (owned by plaintiff and defendant Daniel Johnston) that were not involved in the accident.[31]

{¶ 32} Allstate asserts that the version of R.C. 3937.18 that was in effect on the date of the accident[32] authorized insurance companies to define uninsured automobiles in a way that excludes motor vehicles that are "owned by, furnished to, or available for the regular use of [the injured person,] a spouse, or a resident relative [of insured person]."[33] Allstate also argues that the statute authorized insurance companies to preclude coverage for bodily injury or deaths suffered by an insured "[w]hile the insured is operating or occupying a motor vehicle owned by, furnished to, or available for the regular use of a named insured, a spouse, or a resident relative of a named insured, if the motor vehicle is not specifically identified in the policy under which the claim is made."[34] Allstate then points to the "household" exclusion language in its policy that states:

{¶ 33} "Exclusions—What is not covered.

{¶ 34} "Allstate will not pay any damages an insured person is legally entitled to recover because of bodily injury:

{¶ 35} "* * *

{¶ 36} "2. while in, on, getting into or out of, getting on or off, or when struck by a vehicle owned by or available or furnished for the regular use of you or a resident which is not insured for this coverage."[35]

---

language on which the *Moore* decision expressly based its holding. This court is unaware of any decisions holding that the analysis in *Moore* applies to the amendments in H.B. 261.

**31.** In support of its arguments, Allstate attached to its brief a certified copy of its Policy No. 026272979, a copy of the deposition transcript of plaintiff Kathleen Johnston and a copy of the deposition transcript of defendant Daniel Johnston.

**32.** As explained below, it is difficult to determine the version of the statute that applies in the absence of evidence regarding when the contract period for the policy began.

**33.** R.C. 3937.18(K)(2).

**34.** R.C. 3937.18(J)(1).

**35.** Part III, Section 1, "Bodily injury caused by uninsured motorist."

{¶ 37} In addition, Allstate points to the policy endorsement that was in force at the time of the accident, which states:

{¶ 38} "An Uninsured Auto Is Not:

{¶ 39} "* * *

{¶ 40} "4. A motor vehicle owned by, furnished to, or available for the regular use of the insured person, a spouse, or a resident relative of insured person."

{¶ 41} The deposition testimony of Kathleen Johnston establishes that plaintiff was a co-owner of the motorcycle,[36] which was kept at her residence in an attached garage.[37] Plaintiff lived with her husband, Daniel Johnston, her daughter, Cheryl, and her son, David.[38]

{¶ 42} With respect to the "other-owned auto exclusion" relied upon by Allstate, plaintiff argues in her reply brief (filed June 6, 2001) that (1) in *Martin v. Midwestern Group Ins. Co.*,[39] the Ohio Supreme Court struck down the "other-owned auto" exclusion, holding that the exclusion was unenforceable in UM/UIM policies because it violated the coverage mandated in R.C. 3937.18, (2) on September 3, 1997, H.B. 261 altered the "other-owned auto exclusion" authorized by R.C. 3937.18(K)(2) by limiting the scope of the exclusion to "a motor vehicle owned by, furnished to, or available for the regular use of a *named insured*, a spouse, or a resident relative of a *named insured*,"[40] (3) the "other-owned auto" exclusion is ambiguous, and (4) the "other-owned auto" exclusion was eliminated by amendments to the statute that became effective on September 21, 2000.[41]

{¶ 43} With respect to the "household" exclusion relied upon by Allstate, plaintiff argues in her reply brief that the exclusion does not apply. Plaintiff notes that the exclusion—by its terms—excludes bodily injury claims by insured persons who are injured in connection with an underinsured motor vehicle where the vehicle is "owned by or available or furnished for the regular use of you or a

---

36. See deposition of Kathleen Johnston, page 32.

37. See deposition of Kathleen Johnston, page 33.

38. See deposition of Kathleen Johnston, page 6.

39. *Martin v. Midwestern Group Ins. Co.* (1994), 70 Ohio St.3d 478, 639 N.E.2d 438.

40. Plaintiff's argument in this regard is made by reference to her argument against defendant Westfield's reliance on the same exclusion in the Westfield policy. However, as is noted below, the "named insured" on the Westfield policy was Contour Tool, Inc., whereas the "named insured" on the Allstate policy was the individual plaintiff. In applying uninsured motorist coverage analysis, there is obviously a world of difference between these two fact patterns.

41. See Substitute Senate Bill No. 267, effective 9–21–2000.

resident," but only where the vehicle *"is not insured for this coverage."*[42] (Emphasis added.) Plaintiff argues that the vehicle in this case—the motorcycle—was, in fact, insured for uninsured/underinsured motorists coverage through the policy of insurance issued by Progressive Insurance Company. Therefore, plaintiff argues, the "household" exclusion does not apply.

## ii Conclusions of Law

{¶ 44} The first question this court must address is which version of R.C. 3937.18 applies to the issues raised by the Allstate policy language. Ohio law provides that "[f]or the purpose of determining the scope of coverage of an underinsured motorist claim, the statutory law in effect *at the time of entering into a contract* for automobile liability insurance controls the rights and duties of the contracting parties."[43] (Emphasis added.) In addition, the commencement of *each policy period* mandated by R.C. 3937.31(A) brings into existence a new contract of automobile insurance—regardless of whether the policy is categorized as a new policy of insurance or a renewal of an existing policy—and the guarantee period mandated by R.C. 3937.31(A) is not limited solely to the first two years following the initial institution of coverage.[44]

{¶ 45} In the present case, it is not clear when plaintiff and her husband first purchased Allstate Policy No. 0 26 272979. The documents attached to plaintiff's motion for summary judgment and Allstate's brief in opposition are copies of a "Renewal" of the policy, showing that the policy was in effect for a six-month period—from June 12, 1999 to December 12, 1999—that included the date of the accident. However, the policy renewal does not indicate when the policy was first purchased. Accordingly, this court is without a factual basis for determining exactly when the mandatory two-year period began or when it may have been renewed. The key question, however, is whether the applicable version of R.C. 3937.18 includes the provisions of Amended Substitute House Bill No. 261 (effective 9–3–1997). Notwithstanding the lack of evidence regarding when the

---

42. {¶ a} As noted above, the exact language of the "household" exclusion is:
 {¶ b} "Exclusions—What is not covered.
 {¶ c} "Allstate will not pay any damages an insured person is legally entitled to recover because of bodily injury:
 {¶ d} "* * *
 {¶ e} "2. while in, on, getting into or out of, getting on or off, or when struck by a vehicle owned by or available or furnished for the regular use of you or a resident which is not insured for this coverage."

43. *Ross v. Farmers Ins. Group of Cos.* (1998), 82 Ohio St.3d 281, 695 N.E.2d 732 (4–3) (Douglas, J., with Resnick, F.E. Sweeney and Pfeifer, JJ., concurring).

44. *Wolfe v. Wolfe* (2000), 88 Ohio St.3d 246, 725 N.E.2d 261 (5–2) (Douglas, J., with Moyer, C.J., Resnick, F.E. Sweeney and Pfeifer, JJ., concurring).

Allstate policy was first purchased, it may be possible to determine this question from the evidence before the court.

{¶ 46} It is evident from the renewal period (6–12–1999 to 12–12–1999) that Allstate renewed its coverage every six months. Since this was a renewal, the *latest* date on which the two-year period could have begun to run would have been December 12, 1998 (assuming that the initial policy was first purchased on that date, and then renewed for the first time on June 12, 1999).

{¶ 47} However, determining the *earliest* date on which the two-year period could have begun to run is a more difficult task. Civ.R. 56 requires this court to view the evidence most strongly against the movant and in favor of the party against whom the motion for summary judgment has been made. Plaintiff has not provided this court with any evidence of when the Allstate policy was first purchased, nor for that matter has plaintiff provided this court with any evidence regarding whether the statutorily required two-year policy period began before or after the effective date of the amendments enacted by H.B. 261. Hence, when considering plaintiff's motion for summary judgment against Allstate, this court must conclude that plaintiff has failed to establish that she is entitled to judgment "as a matter of law," if only because she has failed to establish a factual foundation sufficient to determine what the governing law is in this case.

{¶ 48} Similarly, construing the evidence most strongly in favor of Allstate, it is possible to infer from the renewal policy that plaintiff and her husband did not allow the Allstate policy to lapse and that they did not change automobile insurance carriers.[45] If there had been a lapse or a change in insurance carriers, presumably the parties would have brought that fact to the attention of the court. Based on those inferences, the possible relevant dates for the commencement of the two-year period are June 12, 1997, December 12, 1997, June 12, 1998, and December 12, 1998.[46] If the two-year policy period began on any of the last three of these dates, then the policy would have been governed by the amendments that had been previously enacted by H.B. 261 (effective 9–3–1997). And if the two-year period commenced on June 12, 1997, then the renewal policy that was attached to plaintiff's motion for summary judgment would have begun a new two-year policy period that also would have included the amendments of Amended Substitute House Bill No. 261.

---

**45.** Under Civ.R. 56, these inferences can only be entertained by the court when such inferences favor the party against whom the motion has been made.

**46.** If the initial policy purchase occurred prior to 6–12–1997, then a two-year renewal would have occurred subsequent to the enactment of Amended Substitute House Bill No. 261, incorporating the amended statute's requirements into the policy.

{¶ 49} Accordingly, for the purpose of ruling on plaintiff's motion for summary judgment against Allstate—and since the foregoing inferences favor Allstate—the court can conclude that the Allstate policy was governed by the version of R.C. 3937.18 that included the amendments enacted by Amended Substitute House Bill No. 261. By adding the following statutory language, H.B. 261 authorized insurers to include in their policy what is known as the "other-owned auto" exclusion:

{¶ 50} "(J) The coverages offered under division (A) of this section or selected in accordance with division (C) of this section may include terms and conditions that preclude coverage for bodily injury or death suffered by an insured under any of the following circumstances:

{¶ 51} "(1) While the insured is operating or occupying a motor vehicle owned by, furnished to, or available for the regular use of a named insured, a spouse, or a resident relative of a named insured, if the motor vehicle is not specifically identified in the policy under which a claim is made, or is not a newly acquired or replacement motor vehicle covered under the terms of the policy under which the uninsured and underinsured motorist coverages are provided[.]"

{¶ 52} Similarly, H.B. 261 added a definition section which states, in pertinent part, as follows:

{¶ 53} "(K) As used in this section, "uninsured motor vehicle" and "underinsured motor vehicle" do not include any of the following motor vehicles:

{¶ 54} "* * *

{¶ 55} "(2) A motor vehicle owned by, furnished to, or available for the regular use of a named insured, a spouse, or a resident relative of a named insured[.]"

{¶ 56} Allstate's policy contains an "other-owned auto" exclusion as authorized by R.C. 3937.18(J)(1). The policy also contains an endorsement based on R.C. 3937.18(K)(2) that excludes from the definition of "uninsured auto" "a motor vehicle owned by, furnished to, or available for the regular use of the insured person, a spouse, or a resident relative of insured person."

{¶ 57} Viewing the evidence most strongly in favor of Allstate, the court concludes—solely for the purpose of ruling on plaintiff's motion for summary judgment—that (1) the plaintiff's claims are barred by the "other-owned auto" exclusion in the policy, and (2) the motorcycle on which the plaintiff's decedent was riding at the time of the accident was not an "uninsured auto" as that term is defined in the policy.

{¶ 58} For the foregoing reasons, plaintiff's motion for summary judgment against Allstate is hereby denied.

### B. Allstate's Purported Motion for Summary Judgment Against Plaintiff

{¶ 59} As a preliminary matter, the court needs to address the question of whether defendant Allstate has, in fact, filed a motion for summary judgment. On May 24, 2001, defendant Allstate filed a document styled "Allstate Insurance Company's brief in opposition to plaintiff's declaratory relief and motion for summary." The opening sentence of that document states:

{¶ 60} "Now comes defendant, Allstate Insurance Company, by and through counsel, Keller and Curtain Co., L.P.A., and files this Brief in Opposition to the declaratory action and Motion for Summary Judgment filed by plaintiff."

{¶ 61} Similarly, in its conclusion, the brief in support merely asks this court to deny plaintiff's motion. Hence, by its styling, by its terms, and by the relief sought, Allstate's document purports to be a brief in opposition. On its face, it does not purport to be a motion for summary judgment.

{¶ 62} On the other hand, however, defendant Allstate's brief in support asserts on the third unnumbered page: "Accordingly, defendant Allstate is entitled to Summary Judgement [sic] as a matter of law." Similarly, on the fifth unnumbered page of the brief in support, defendant Allstate asserts: "Therefore, Allstate respectfully requests that they be dismissed from this action." And on the second page of defendant Allstate's document, it asks the court to "allow Allstate Insurance Company to be dismissed from this action." Furthermore, on June 6, 2001, plaintiff filed her "Reply brief in support of its motion for summary judgment and in opposition to *motion for summary judgment* filed by * * * Allstate Insurance Co.," and on June 18, 2001, Allstate filed its "Reply brief to plaintiff's brief in opposition to defendant Allstate's *motion for summary judgment.*" (Emphasis added.) Hence, notwithstanding the fact that Allstate's document does not, on its face, purport to be a motion for summary judgment, both plaintiff and Allstate appear to have treated it as containing Allstate's motion for summary judgment.

{¶ 63} In Ohio, before a trial court is authorized to grant summary judgment in favor of a party, that party must properly file a motion for summary judgment.[47] The mere fact that the parties have erroneously proceeded as though a motion for summary judgment has been filed does not confer authority on the trial court to grant summary judgment.[48] Accordingly, since it appears that defendant Allstate has not filed a motion for summary judgment against plaintiff, it is unnecessary for this court to rule on such a motion.

---

47. *Marshall v. Aaron* (1984), 15 Ohio St.3d 48, 15 OBR 145, 472 N.E.2d 335.

48. Id.

{¶ 64} In addition, defendant Allstate has also failed to provide this court with sufficient evidence to establish whether the Allstate policy is governed by the amendments enacted by H.B. 261.[49] Hence, even if the document filed by defendant Allstate on May 24, 2001, had been properly filed as a motion for summary judgment, construing the evidence most strongly in favor of plaintiff, defendant Allstate's motion would have been denied.

## 2. The Cincinnati Policies

### Plaintiff's Motion for Summary Judgment Against Cincinnati, and Cincinnati's Motion for Summary Judgment Against Plaintiff

### i. Arguments of the Parties

{¶ 65} As noted above, plaintiff filed her motion for summary judgment against defendant Cincinnati on May 11, 2001. Defendant Cincinnati filed its memorandum contra plaintiff's motion for summary judgment on May 18, 2001, and plaintiff filed her reply brief on June 6, 2001.

{¶ 66} Plaintiff argues first that the "primary" Cincinnati policy (No. 0638871) provides coverage to Lake County Board of Commissioners and its subsidiary units. Plaintiff alleges that the policy has an original effective date of 7–1–1995 through 7–1–1998, and that on 7–1–1997, the expiration date was extended to 7–1–2000.[50] Since the amendments enacted by H.B. 261 became effective on September 3, 1997—two months after the policy renewal—plaintiff argues that under *Ross v. Farmers Ins. Group of Cos.*,[51] the renewal of the primary policy on 7–1–1997 began a new three-year policy period for purposes of determining the

---

**49.** See discussion above of plaintiff's failure to do the same thing. Both parties attached a copy of the renewal policy to their pleadings, with no mention of when the statutorily required two-year policy period began. *Gray v. State Farm Ins. Cos.* (Apr. 2, 2001), 12th Dist. No. CA2000–08–167, 2001 WL 322718 (genuine issue of material fact arose when neither party provided evidence regarding when the parties entered into insurance contract, making applicable law impossible to determine).

**50.** Plaintiff's assertion of this material fact is based on the certified copy of the Cincinnati Common Policy Declarations page for policy No. 0638871. The declarations page shows that (1) the typed year "1998" has been crossed out by hand, (2) the year "2000" has been written in by hand, and (3) the date "7–1–97" has been handwritten underneath the number "2000" and placed inside a hand-drawn rectangle. Similarly, the declaration page for the umbrella policy (No. 4381115) shows the original policy period as being from 7–1–1995 to 7–1–1997, but the typed "1997" is struck through with a single handwritten line, and the number 2000 is handwritten above it. Cincinnati does not dispute plaintiff's factual assertion that these markings indicate that the parties contracted for a new policy period from 7–1–1997 to 7–1–2000 for both the primary and the umbrella policy.

**51.** *Ross v. Farmers Ins. Group of Cos.* (1998), 82 Ohio St.3d 281, 695 N.E.2d 732.

statutory law governing the rights and duties under the policy.[52] Therefore, plaintiff argues that the amendments to R.C. 3937.18 that are contained in H.B. 261 do not govern the rights and duties under the Cincinnati primary policy.

{¶ 67} Having established which version of the underinsured motorist statute applies to the primary Cincinnati policy, plaintiff then argues that the policy "does not contain a valid selection form which allows the insured to obtain coverage in a lesser amount than the $1,000,000 of coverage provided under the liability policy." Therefore, plaintiff asserts, the primary Cincinnati policy is deemed to provide "$1,000,000.00[53] of liability and/or UIM coverage."[54] (Footnote added.)

{¶ 68} Citing *Scott–Pontzer*[55] and *Ezawa*,[56] plaintiff then asserts that Kathleen Johnston—as an employee of Lake County—and her deceased son, David Johnston, are deemed "insureds" under UIM coverage provided by the primary Cincinnati policy because the "Cincinnati Insurance Company UM/UIM Ohio Form contains the same language defining who is an insured as that which was reviewed and construed in the *Scott–Pontzer* case."

{¶ 69} Plaintiff then argues that (1) the "household exclusion" in the primary Cincinnati policy is unenforceable under *State Farm v. Alexander*,[57] and (2) the "other-owned vehicle" exclusion in the primary Cincinnati policy is unenforceable under *Martin v. Midwestern Group Insurance Company*.[58]

{¶ 70} With respect to the Cincinnati umbrella policy, plaintiff argues that the policy is subject to the same statutory scheme as the primary policy and that the umbrella policy likewise does not contain an effective rejection and/or selection form. Hence, plaintiff argues that UIM coverage should be read into the umbrella policy by operation of law, providing UIM coverage equal to the

---

52. *Wolfe v. Wolfe* (2000), 88 Ohio St.3d 246, 725 N.E.2d 261.

53. The copy of the Ohio uninsured motorist endorsement that is attached to plaintiff's motion shows UIM policy limits of $500,000. Defendant Cincinnati argues that the UIM policy limits are therefore $500,000. However, the liability portion of the policy shows policy limits of $1,000,000. In the absence of a valid and executed offer/rejection form, the statute requires the UIM coverage to match at least the amount of the liability coverage.

54. In support, plaintiff cites *Linko v. Indemn. Ins. Co. of N. Am.* (2000), 90 Ohio St.3d 445, 739 N.E.2d 338.

55. *Scott–Pontzer v. Liberty Mut. Fire Ins. Co.* (1999), 85 Ohio St.3d 660, 710 N.E.2d 1116.

56. *Ezawa v. Yasuda Fire & Marine Ins. Co. of Am.* (1999), 86 Ohio St.3d 557, 715 N.E.2d 1142.

57. *State Farm Auto. Ins. Co. v. Alexander* (1992), 62 Ohio St.3d 397, 583 N.E.2d 309.

58. *Martin v. Midwestern Group Ins. Co.* (1994), 70 Ohio St.3d 478, 639 N.E.2d 438.

umbrella liability limits of $5,000,000. Plaintiff asserts that this UIM coverage is in addition to that provided under the primary Cincinnati policy.

{¶ 71} In response to plaintiff's motion, defendant Cincinnati relies on *Sexton v. State Farm Mut. Auto. Ins. Co.*[59] for the proposition that plaintiff must prove four things: (1) that plaintiff and/or plaintiff's decedent are insureds, (2) that they are legally entitled to recover damages sustained because of injury or death caused by an uninsured motorist, (3) that such damages result from injury, sickness, disease, or death, and (4) that the tortfeasor was the owner or operator of an uninsured motor vehicle.

{¶ 72} Defendant Cincinnati argues in its "memorandum contra" that plaintiff has failed to establish a prima facie case entitling plaintiff to UM/UIM coverage under the Cincinnati policies because plaintiff has not provided evidence to show that (1) defendant Daniel Johnston was an underinsured motorist, (2) defendant Daniel Johnston caused the death of David Johnston, (3) plaintiff's damages will exceed the limits of available liability insurance, or (4) that Kathleen Johnston or David Johnston were insureds under the Cincinnati policies.

{¶ 73} Defendant Cincinnati also argues—in its own motion for summary judgment—that plaintiff is not an "insured" under *Scott–Pontzer* analysis because such analysis does not apply where the insured is a county board of commissioners and not a corporation. Defendant Cincinnati argues that *Scott–Pontzer* does not apply because the board is allegedly "not legally authorized to purchase personal UM/UIM liability or umbrella coverage for off-duty employees operating or riding in vehicles not owned by the county."

{¶ 74} With respect to plaintiff's decedent, defendant then argues that since plaintiff is not an insured, David Johnston is not an "insured" either, since his status as an "insured" is dependent on that of his mother.[60]

{¶ 75} Defendant also argues (in its motion for summary judgment) that even if *Scott–Pontzer* and *Ezawa* provide coverage under the *primary* policy, there is no express "any family member" language in the *umbrella* policy that would allow UIM coverage to extend to David Johnston under the umbrella policy by operation of law. In this regard, defendant focuses on factual distinctions between the present case and the facts in *Scott–Pontzer* and *Ezawa*. In *Scott–Pontzer*, the injured party was an employee of the corporate named insured. In the present case, however, the injured party is the son of the employee of the

---

**59.** *Sexton v. State Farm Mut. Auto. Ins. Co.* (1982), 69 Ohio St.2d 431, 23 O.O.3d 385, 433 N.E.2d 555.

**60.** *Ezawa v. Yasuda Fire & Marine Ins. Co. of Am.* (1999), 86 Ohio St.3d 557, 715 N.E.2d 1142.

county named insured. *Ezawa*, which did involve injuries to the child of a corporate employee, involved a primary business automobile liability policy that contained the now-familiar ambiguous language, including the "any family member" provision in the definition of "who is an insured." In the present case, however, the Cincinnati umbrella policy does not contain the same definitional language as appeared in the business automobile policy in *Ezawa*. Hence, defendant argues that in the absence of such express definitional language in the umbrella policy—that can be construed to define the son of an employee of the county as an "insured" under the umbrella policy—UIM coverage under the umbrella policy cannot be extended to David Johnston.

## ii. Conclusions of Law

### The Applicable Statutory Scheme

 {¶ 76} First, the court agrees with plaintiff that both the primary and the umbrella Cincinnati policies are governed by the state of the law as it existed on the date of the policy renewal: July 1, 1997. When the policy was renewed, the parties agreed to extend the policy period to July 1, 2000.[61] Accordingly, the amendments contained in H.B. 261 have no application to the issues pertaining to the Cincinnati policies.[62] Similarly, both the "other-owned vehicle" exclusion and the "household" exclusion are unenforceable under *Martin v. Midwestern Group Ins. Co.*[63] and *State Farm Auto. Ins. Co. v. Alexander.*[64]

### The Policy Limits

 {¶ 77} Second, the court agrees with plaintiff that neither of the Cincinnati policies contains a valid rejection form signed by the insured.[65] Accordingly, the UIM policy limits are $1,000,000 on the primary Cincinnati policy and $5,000,000 on the Cincinnati umbrella policy.

---

**61.** Under *Wolfe v. Wolfe* (2000), 88 Ohio St.3d 246, 725 N.E.2d 261, the statute requires a guaranteed *minimum* two-year policy period during which the policy cannot be altered except by agreement of the parties and in accordance with statutory requirements. Here, the parties agreed to a renewed policy period of three years. Under *Ross v. Farmers Ins. Group of Cos.*, therefore, they agreed that their respective rights and duties under the policy would be subject to the law as it existed on 7–1–1997 for the entire three-year period.

**62.** *Ross v. Farmers Ins. Group of Cos.* (1998), 82 Ohio St.3d 281, 695 N.E.2d 732.

**63.** *Martin v. Midwestern Group Ins. Co.* (1994), 70 Ohio St.3d 478, 639 N.E.2d 438.

**64.** *State Farm Auto. Ins. Co. v. Alexander* (1992), 62 Ohio St.3d 397, 583 N.E.2d 309.

**65.** As plaintiff points out, there is a selection form attached to the policy that purports to select UIM limits of $500,000. However, this form is not executed by the insured and is therefore invalid under *Linko v. Indemn. Ins. Co. of N. Am.* (2000), 90 Ohio St.3d 445, 739 N.E.2d 338.

The Status of Plaintiff and Her Decedent as Insureds

{¶ 78} Third, the court finds that plaintiff's reliance upon *Scott–Pontzer v. Liberty Mutual Fire Insurance*[66] and *Ezawa v. Yasuda Fire & Marine Insurance Company of America*,[67] for the conclusion that plaintiff and her decedent were insureds under the Cincinnati policies, is correct.

{¶ 79} The *Scott–Pontzer* decision was based squarely on the fact that—as applied to the UIM coverage that had been sold to the corporate named insured—the use of the word "You" in the definition of "Who is an insured" was ambiguous. In *Scott–Pontzer*, the corporation was the only named insured on the policies. The plaintiff's decedent was an employee of the corporation who was injured while acting outside the course and scope of his employment. The court found that—since the corporate entity cannot sustain bodily injury or occupy a motor vehicle—the statutorily mandated UIM coverage makes sense only when it applies to individuals. But the policy failed to clarify which of the many individuals who were associated with the corporate named insured (officers, directors, stockholders, employees, etc.) were to be covered by the UIM provisions. Therefore, the court concluded that the policy language was ambiguous, and that it should be construed against the insurer to include UIM coverage of the plaintiff's decedent. And since the policy failed to limit UIM coverage of the corporation's employees to those occasions when the employees were acting within the course and scope of their employment, the fact that plaintiff's decedent was acting outside the course and scope when he was injured was held to be irrelevant.

{¶ 80} In the present case, the Cincinnati policies list the following as the named insured: The board of county commissioners, in and for Lake County, Ohio, and its subsidiary units, commissions, departments, and organizations as they are now constituted or shall hereafter be constituted. Hence, this court must decide whether the holding in *Scott–Pontzer*—which was based on the corporate nature of the named insured—applies with equal force to cases where the named insured is not a corporation, but rather is a board of county commissioners and those organizational entities that are subject to the authority of the board of county commissioners.

{¶ 81} At the outset, it is clear that a county board of commissioners ("board") and a corporation are categorically different entities. A board is a political subdivision created by authority of the Ohio Constitution, whereas a

---

66. *Scott–Pontzer v. Liberty Mut. Fire Ins. Co.* (1999), 85 Ohio St.3d 660, 710 N.E.2d 1116.

67. *Ezawa v. Yasuda Fire & Marine Ins. Co. of Am.* (1999), 86 Ohio St.3d 557, 715 N.E.2d 1142.

corporation is a business entity (whether public or private, or for profit or nonprofit) that is formed by the filing of articles of incorporation and that lacks any governmental powers whatsoever. The Ohio Constitution delegates to the General Assembly the task of enacting legislation authorizing the formation of both county government[68] and private corporations,[69] and the General Assembly has done so using vastly different legislative language. The members of the board are elected by the general voting public, whereas the directors of a corporation can be chosen in a variety of ways—most often by the vote of stockholders. Additionally, a board possesses political subdivision tort immunity when performing certain governmental functions[70]; a corporation does not.

{¶ 82} With respect to the authority to purchase insurance for their respective employees, the two entities are quite similar. A board is specifically authorized by statute to purchase policies of insurance insuring its employees "against liability on account of damage or injury to persons and property, including liability on account of death by wrongful act, occasioned by the operation of a motor vehicle[.]"[71] In addition, a board is specifically authorized by statute to "procure a policy or policies of insurance insuring any county employee against liability arising from the performance of the county employee's official duties."[72] Similarly, the General Assembly has enacted legislation specifically authorizing corporations to procure liability insurance for their employees without any regard for whether they are current or former employees or acting within the scope of their employment.[73]

{¶ 83} However, when considering whether the holding in *Scott–Pontzer* should apply to a county board of commissioners, none of the foregoing differences or similarities is material. The salient and material fact is that—just as

---

**68.** Ohio Constitution, Section 1, Article X.

**69.** Ohio Constitution, Section 2, Article XIII.

**70.** R.C. 2744.01 et seq.

**71.** R.C. 307.44.

**72.** R.C. 307.441(E).

**73.** R.C. 1701.13(E)(7) states: "A corporation may purchase and maintain insurance or furnish similar protection, including, but not limited to, trust funds, letters of credit, or self-insurance, on behalf of or for any person who is or was a director, officer, employee, or agent of the corporation, or is or was serving at the request of the corporation as a director, trustee, officer, employee, member, manager, or agent of another corporation, domestic or foreign, nonprofit or for profit, a limited liability company, or a partnership, joint venture, trust, or other enterprise, against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such, whether or not the corporation would have the power to indemnify him against such liability under this section. Insurance may be purchased from or maintained with a person in which the corporation has a financial interest."

corporations can act only by and through natural persons—a board of county commissioners (and its subservient organizational entities) can act only by and through natural persons. To paraphrase the *Scott–Pontzer* opinion:

{¶ 84} "It would be nonsensical to limit protection solely to the [board], since a [board], itself, cannot occupy an automobile, suffer bodily injury or death, or operate a motor vehicle. Here, naming the [board] as the insured is meaningless unless the coverage extends to some person or persons—including to the [board's] employees."

{¶ 85} The Supreme Court of Ohio has tacitly recognized that the *Scott–Pontzer* decision is applicable to political subdivisions. In 1998—prior to the *Scott–Pontzer* ruling—the Muskingum County Court of Appeals ruled in *Headley v. Ohio Govt. Risk Mgt. Plan* (Mar. 20, 1998), 5th Dist. No. CT97–0017, 1998 WL 517691, that a township clerk was not entitled to underinsured motorist coverage under the township's policy since only the political subdivision, and not its individual employees, was intended to be covered thereunder. When the Ohio Supreme Court issued the *Scott–Pontzer* decision, it also reversed the *Headley* decision.[74]

{¶ 86} In the uninsured motorist endorsement attached to the primary Cincinnati policy, the "who is an insured" language is identical to the "who is an insured" language that appeared in the policy in *Scott–Pontzer*.[75] Therefore, plaintiff and her decedent are "insureds" under the primary Cincinnati policy. Plaintiff is an insured because she was an employee of the named insured and, therefore, falls under the ambiguous definition of "You," and plaintiff's decedent is an insured because he was "any family member" of plaintiff.

{¶ 87} Similarly, the analysis in *Scott–Pontzer* applies with equal force to the question of whether plaintiff and her decedent were insureds under the Cincinnati umbrella liability policy. In *Scott–Pontzer*, the Ohio Supreme Court found that the plaintiff's decedent was an insured under the umbrella policy because the insurer failed to offer uninsured/underinsured motorist coverage under the employer's umbrella policy. The *Scott–Pontzer* court noted that the

---

74. *Headley v. Ohio Govt. Risk Mgt. Plan* (1999), 86 Ohio St.3d 64, 711 N.E.2d 679.

75. {¶ a} In the uninsured motorist endorsement attached to the primary Cincinnati policy, "who is an insured" is defined as follows:

{¶ b} "1. You.

{¶ c} "2. If you are an individual, and 'family member.'

{¶ d} "3. Anyone else 'occupying' a covered 'auto' or a temporary substitute for a covered 'auto.' The covered 'auto' must be out of service because of its breakdown, repair, servicing, loss or destruction.

{¶ e} "4. Anyone for damages he or she is entitled to recover because of 'bodily injury' sustained by another 'insured.' "

umbrella policy did not contain an uninsured motorist coverage form that defined insureds for purposes of underinsured motorist coverage. The court reasoned:

{¶ 88} "In *Duriak v. Globe Am. Cas. Co.* (1986), 28 Ohio St.3d 70, 72, 28 OBR 168, 170, 502 N.E.2d 620, 622–623, we held that excess liability insurance must comport with R.C. 3937.18 and thus uninsured (and underinsured) motorist coverage must be tendered. Further, in *Gyori v. Johnston Coca–Cola Bottling Group* (1996), 76 Ohio St.3d 565, 568, 669 N.E.2d 824, 827, we stated that failure by the insurer to offer such coverage results in the provision of such coverage by operation of law. Absent any showing that underinsured coverage was offered and rejected, such coverage is included in the policy."[76]

{¶ 89} In the present case, Cincinnati did not tender uninsured motorist coverage with the umbrella policy.[77] Hence, the umbrella policy is hereby deemed to include UM/UIM coverage as a matter of law.

{¶ 90}· Defendant Cincinnati's argument that the umbrella policy does not cover the plaintiff's decedent because *Ezawa* (extending coverage by operation of law to a corporate employee's injured child) was based on a business automobile policy, and not an umbrella policy, is not well taken. The Cincinnati umbrella policy provisions—like those in the umbrella policy in *Scott–Pontzer*—pertain to the liability coverage, not the UM/UIM coverage that is imposed by operation of law. Therefore, the absence of a specific definition in the umbrella policy authorizing umbrella UM/UIM coverage for "any family member" is irrelevant.

### Whether the UIM Coverage is Limited by Scope of Employment

{¶ 91} Having determined that plaintiff and plaintiff's decedent were both insureds under Cincinnati's primary and umbrella policies, the next question—according to the analysis in *Scott–Pontzer*—is whether the coverage was limited to those circumstances where the injured party was acting within the scope of employment. In *Scott–Pontzer*, the court reasoned:

{¶ 92} "The Liberty Fire [primary] policy contains no language requiring that employees must be acting within the scope of their employment in order to receive underinsured motorist coverage. Thus, we find that appellant is entitled to underinsured motorist benefits under the Liberty Fire [primary] policy.

---

76. *Scott–Pontzer v. Liberty Mut. Fire Ins. Co.* (1999), 85 Ohio St.3d 660, 665, 710 N.E.2d 1116, 1120.

77. There is attached to the umbrella policy an unsigned "exclusion of excess uninsured/underinsured motorist coverage endorsement" by which defendant Cincinnati evidently attempted to exclude such coverage. A similar unsigned rejection form was attached to the primary Cincinnati policy.

{¶ 93} "On the other hand, Liberty Mutual's umbrella/excess insurance policy did restrict coverage to employees acting within the scope of their employment. However, we have already found that Liberty Mutual had failed to offer underinsured motorist coverage through the umbrella policy issued to Superior Dairy. Thus, any language in the Liberty Mutual umbrella policy restricting insurance coverage was intended to apply solely to excess *liability* coverage and not for purposes of underinsured motorist coverage. See, e.g., *Demetry v. Kim* (1991), 72 Ohio App.3d 692, 698, 595 N.E.2d 997, 1001. Therefore, there is no requirement in the umbrella policy that Pontzer had to be acting during the scope of his employment to qualify for underinsured motorist coverage. Therefore, appellant is entitled to underinsured motorist benefits under the Liberty Mutual umbrella policy as well."[78]

{¶ 94} Similarly, in the present case, the uninsured/underinsured coverage afforded by both the primary and the umbrella policies is not restricted to instances where the employee or the injured party is acting within the course and scope of employment. The primary Cincinnati policy does not limit its UM/UIM coverage to employees acting within the course and scope of employment. And although the umbrella policy does contain language defining insureds as employees acting within the course and scope of their employment, it is apparent that this language was intended to apply to the liability provisions of the umbrella policy, and not the UM/UIM coverage.

### Prima Facie Evidence

{¶ 95} Defendant Cincinnati has argued in its memorandum contra that plaintiff has not provided sufficient prima facie evidence to show that (1) defendant Daniel Johnston was an underinsured motorist, (2) defendant Daniel Johnston caused the death of David Johnston, and (3) plaintiff's damages will exceed the limits of available liability insurance.

{¶ 96} The evidence before the court indicates that defendant Daniel Johnston was insured in the conventional sense by Progressive Insurance (which covered the motorcycle with limits of $25,000). It is undisputed that plaintiff's decedent was a healthy 17–year–old boy, and that the motorcycle accident proximately caused his death.

{¶ 97} Plaintiff's motion for summary judgment is, by its terms, a motion for partial summary judgment that pertains to the insurance coverage issues only. In this regard, plaintiff has asserted in her complaint that her damages, and those of the estate of her decedent, exceed the available policy limits. Defendant

---

78. *Scott–Pontzer v. Liberty Mut. Fire Ins. Co.* (1999), 85 Ohio St.3d 660, 666, 710 N.E.2d 1116, 1120.

Cincinnati has denied this. Therefore, there is before the court a justiciable controversy regarding the existence, scope, limits, and position (primary, excess, setoffs, etc.) of the alleged insurance coverage. In drawing the court's attention to the insurance coverage questions, it is not incumbent upon the plaintiff also to prove the underlying merits of her claims at this juncture.

### 3. The Westfield Policies

Plaintiff's Motion for Summary Judgment Against Westfield, and Westfield's Motion to Dismiss, or Alternatively, Combined Brief in Opposition to Plaintiff's Motion for Summary Judgment and Cross–Motion for Summary Judgment

{¶ 98} At some time prior to October 27, 1998, defendant Westfield issued a "package policy" (Policy No. CWP 3 557 704) to Contour Tool, Inc. as the sole named insured.[79] The "package policy" contained both business auto and umbrella coverage[80] under the same policy for the period from October 27, 1998, to October 17, 1999. On the date of the accident, Contour Tool, Inc. employed the driver of the motorcycle (and the father of the decedent), Daniel Johnston.

### i. Arguments of the Parties

{¶ 99} Referring to the primary coverage section of the Westfield policy, plaintiff notes that the uninsured motorist endorsement uses a definition of "Who is an insured" that is identical to the definition used in the primary policy that was at issue in *Scott–Pontzer*. Therefore, plaintiff argues that the analysis in *Scott–Pontzer* controls, making an employee of Contour Tool, Inc.—including defendant Daniel Johnston—an "insured" under the ambiguous language of the policy.

{¶ 100} Plaintiff also argues that none of the exclusions contained in the primary coverage portion of the Westfield policy apply to the loss at issue in this case. In this regard, plaintiff identifies three possible exclusions in the Westfield policy:

{¶ 101} "C. Exclusions

{¶ 102} "This insurance does not apply to:

{¶ 103} "* * *

---

**79.** The copy of the Westfield policy attached to plaintiff's motion for summary judgment is a copy of a "renewal." Neither plaintiff nor defendant Westfield has provided this court with evidence regarding the original contract date for this policy.

**80.** The business auto coverage contained a policy limit of $1,000,000. The umbrella coverage also contained a policy limit of $1,000,000.

{¶ 104} "5. 'Bodily injury' sustained by:

{¶ 105} "a. You while 'occupying' or when struck by *any vehicle owned by you that is not a covered 'auto'* for Uninsured Motorists Coverage under this Coverage Form;

{¶ 106} "b. Any 'family member' while 'occupying' or when struck by *any vehicle owned by that 'family member' that is not a covered 'auto'* for Uninsured Motorists Coverage under this Coverage Form; or

{¶ 107} "c. Any 'family member' while 'occupying' or when struck by *any vehicle owned by you that is insured for Uninsured Motorists Coverage on a primary basis under any other Coverage Form or policy.*" (Emphasis added.)

{¶ 108} With respect to the exclusion set forth in paragraph 5.a., plaintiff argues that it does not apply because the claimants in this case—Kathleen Johnston and the estate of her deceased son, David Johnston—are not employees of Contour Tool, Inc., and as nonemployees they cannot be deemed to be covered by the term "you" as it is used in the first exclusion. Citing *Scott–Pontzer*, plaintiff argues that "you" means the employer and/or the employee; it does not mean a "family member" of an employee.

{¶ 109} With respect to the exclusion set forth in paragraph 5.b., plaintiff argues that it does not apply to plaintiff Kathleen Johnston because, even though she is a "family member," she was not occupying the motorcycle when the accident occurred. Plaintiff also argues that this exclusion does not apply to the estate of David Johnston because, even though he was "occupying" the motorcycle at the time of the accident, he did not own the motorcycle.

{¶ 110} Similarly, with respect to the exclusion set forth in paragraph 5.c., plaintiff argues that it does not apply to plaintiff Kathleen Johnston because she was not occupying the motor vehicle at the time of the accident. Plaintiff then argues that the exclusion in paragraph 5.c. is invalid and unenforceable because it is a "super-escape" clause that seeks to nullify any UM/UIM coverage otherwise available under the policy on the basis that similar insurance is available under any other policy.

{¶ 111} In the umbrella portion of the Westfield policy, plaintiff focuses on the following definition of "Who is an insured":

{¶ 112} "Section II—Who is an insured

{¶ 113} "* * *

{¶ 114} "3. Each of the following is also an insured:

{¶ 115} "* * *

{¶ 116} "b. Any other person or organization which is included as an insured under the insurance listed in the Schedule of Underlying Insurance but only insofar as coverage is afforded to that person or organization by that insurance."

{¶ 117} Plaintiff argues that since both Kathleen Johnston and David Johnston are deemed insureds under the terms and conditions of the underlying primary policy, they are likewise entitled to the same status as an insured under the umbrella portion of the policy.

{¶ 118} Second, plaintiff argues that $1,000,000 of UM/UIM coverage should be read into the umbrella portion of the Westfield policy as a matter of law because the policy does not contain a valid rejection of UM/UIM coverage as mandated under R.C. 3937.18.

{¶ 119} In response to plaintiff's motion, defendant Westfield makes the following seven arguments: (1) The court lacks jurisdiction due to plaintiff's failure to join all potentially liable parties; (2) Plaintiff is not entitled to UIM coverage under the business auto section of Westfield's policy; (3) Plaintiff is not entitled to UIM coverage under the umbrella section of Westfield's policy; (4) Any UIM coverage alleged to be available under Westfield's umbrella section is only excess coverage subject to the retained limit; (5) The business auto policy and umbrella do not afford UIM coverage for plaintiff's claims pursuant to their terms, and any attempt to impute such coverage pursuant to the Ohio Supreme Court's decisions in *Selander, Scott–Pontzer, Ezawa, Wolfe,* and/or *Linko* violate the Contract Clauses in both the United States Constitution and the Ohio Constitution; (6) Even if Westfield were liable, which it is not, it is entitled to set off all limits available for payment under the tortfeasor's policy; and (7) Even if Westfield were liable, which it is not, the policy requires it to pay UIM benefits on a pro rata basis only to the extent that its UIM limits exceed the primary coverage available to plaintiff under other insurance.

### Westfield's First Argument (Failure to Join All Insurance Companies)

{¶ 120} Defendant Westfield's first argument asserts that plaintiff should have joined three additional parties: (1) Allstate (as the issuer of the homeowner's policy under which the decedent was insured); (2) the insurer of Willoughby Workshop, which employed the plaintiff's resident daughter; and (3) the unnamed insurer of the Christian bookstore where plaintiff's decedent worked. Westfield argues that each of these three insurers has potential liability pursuant to *Scott–Pontzer, Ezawa,* and *Selander,* in the same manner that plaintiff has alleged against Westfield. Therefore, under R.C. 2721.12, Westfield argues that the court lacks jurisdiction to rule on plaintiff's claims for declaratory judgment.

{¶ 121} Plaintiff counters Westfield's first argument as follows. First, as to the plaintiff's homeowner's policy with Allstate, plaintiff observes that she has, in fact, asserted a claim against Allstate in her amended complaint, filed March 30, 2001.[81] Hence, Allstate has been joined as a party. Second, as to the insurer of the Willoughby Workshop, plaintiff observes that this employer is an entity run by the Lake County Board of Mental Retardation, which makes it part of the "subsidiary units, commissions, departments, and organizations" of the Board of County Commissioners in Lake County, Ohio. Therefore, plaintiff asserts that the Willoughby Workshop is covered by the same Cincinnati policies that provide coverage through plaintiff's status as an employee of Lake County. Third, as to the insurer of the Christian bookstore where plaintiff's decedent worked, plaintiff argues that she joined that insurer when she filed her amended complaint asserting a "John Doe" claim against the then unknown insurer of David Johnston's employer. Additionally, plaintiff asserts that the decedent's employer was a corporate entity known as "Family Christian Bookstores," and that the corporation was insured under a corporate policy sold by The Hartford in Michigan. Plaintiff asserts that the Michigan policy is not subject to the mandatory UM/UIM requirements of Ohio law.

### Westfield's Second Argument (No UIM Coverage Under the Business Auto Section)

{¶ 122} Defendant Westfield's second argument asserts that coverage under the business automobile section of the Westfield policy is barred for the following two reasons: (1) The policy defines "uninsured motor vehicle" to exclude the motorcycle involved in this accident[82]; and (2) any alleged UIM coverage is excluded. As to the first reason, defendant Westfield argues that the policy specifically excludes from the definition of an "uninsured motor vehicle" "any vehicle * * * [o]wned by or furnished or available for your regular use. * * *"[83] Defendant Westfield argues that since "you" refers to defendant Daniel Johnston,

---

81. Defendant Westfield argues that plaintiff failed to file her amended complaint prior to the court-imposed deadline of March 30, 2001. Although the computerized docket of the Lake County Clerk of Courts shows that the plaintiff's first amended complaint was filed on April 2, 2001, the document itself shows a date-stamp of March 30, 2001. In the absence of a showing of prejudice to any party, and in light of the timely date-stamp on the document, the court hereby deems plaintiff's first amended complaint to be timely filed.

82. Defendant styles this argument with the heading, "No UIM coverage is afforded where Plaintiff is not entitled to recover from the owner or operator of an 'uninsured motor vehicle,' as defined by the policy." However, this heading slightly misstates Westfield's argument, which asserts that plaintiff's claim is actively excluded by the policy definition of "uninsured motor vehicle."

83. {¶ a} This exclusion is commonly referred to as the "other-owned auto" exclusion. Although defendant Westfield does not give a specific reference as to where in the policy this

and since defendant Daniel Johnston co-owned the motorcycle, the motorcycle was therefore specifically excluded from the policy definition of an "uninsured motor vehicle." As a result, defendant Westfield argues that the business automobile coverage does not apply.

{¶ 123} As to the second reason why the business auto coverage does not apply, Westfield argues that Exclusion 5.c. bars such coverage.[84] In this regard, Westfield asserts that "you" includes defendant Daniel Johnston, who co-owned the motorcycle, and that the motorcycle was insured on a primary basis under the Progressive liability insurance policy. Westfield further asserts that the decedent was Daniel Johnston's "family member" and that the decedent was occupying the motorcycle at the time of the accident. Defendant Westfield further argues that the cases cited by plaintiff[85] (to show that Westfield's "escape clause" is unenforceable in this case) are factually distinguishable from the present case.

{¶ 124} Citing *Martin v. Midwestern Group Ins. Co.*,[86] plaintiff responds to Westfield's second argument by asserting that the "other-owned auto" exclusion was struck down by the Ohio Supreme Court as unenforceable in UM/UIM policies because the court construed the exclusion as violating the coverage

---

definitional language appears, it is apparent to the court that defendant is referring to page 4 of the Ohio uninsured motorist endorsement, which states:

{¶ b} "F. Additional Definitions
{¶ c} "As used in this endorsement:
{¶ d} "* * *
{¶ e} "3. Uninsured motor vehicle means a land motor vehicle or trailer:
{¶ f} "* * *
{¶ g} "b. Which is an underinsured motor vehicle. An 'underinsured motor vehicle' means a land motor vehicle or trailer for which the sum of all liability bonds or policies applicable at the time of an 'accident' provides at least the amounts required by the applicable law where a covered 'auto' is principally garaged but their limits are less than the Limit of insurance of this coverage.
{¶ h} "However, 'uninsured motor vehicle' does not include any vehicle:
{¶ i} "* * *
{¶ j} "c. *Owned by or furnished or available for your regular use or that of any 'family member.'*" (Emphasis added.)

**84.** Exclusion 5.c. is quoted verbatim below (see ¶ 144–149) and purports to exclude bodily injuries sustained by any family member while occupying "any vehicle owned by you that is insured for Uninsured Motorists Coverage on a primary basis under any other Coverage Form or policy." This exclusion is also known as an "escape clause." *State Farm Mut. Auto. Ins. Co. v. Home Indemn. Ins. Co.* (1970), 23 Ohio St.2d 45, 52 O.O.2d 170, 261 N.E.2d 128.

**85.** Plaintiff cites the following cases: *Bowerman v. State Farm Ins. Co.* (Sept. 30, 1996), 6th Dist. No. F–95–019, 1996 WL 549207; *State Farm Ins. Co. v. Home Indemn. Co.* (1970), 23 Ohio St.2d 45, 52 O.O.2d 170, 261 N.E.2d 128; *State Farm Mut. Auto. Ins. Co. v. Nationwide Mut. Ins. Co.* (May 24, 1995), 2d Dist. No. 14787, 1995 WL 434076; *Hartford Acc. & Indemn. Co. v. Allstate Ins. Co.* (Dec. 16, 1983), 11th Dist. No. 3193, 1983 WL 6019.

**86.** *Martin v. Midwestern Group Ins. Co.* (1994), 70 Ohio St.3d 478, 639 N.E.2d 438.

requirements of R.C. 3937.18. Plaintiff then notes that the statute was amended effective September 3, 1997, by "Senate [sic] Bill 261" to permit the "other-owned auto" exclusion, but only where the motor vehicle was "owned by, furnished to, or available for the regular use of a *named insured,* a spouse, or a resident relative of a *named insured.*"[87] Plaintiff then points out that the "named insured" under the Westfield policy is Contour Tool, Inc., and that Contour Tool, Inc. neither owned nor furnished the motorcycle, nor was the motorcycle furnished for the regular use of Contour Tool, Inc. Therefore, plaintiff argues, the "other-owned auto" exclusion—even if valid under the H.B. 261 amendments—does not apply. Plaintiff then argues that the most recent change to the statute, effective September 21, 2000, has eliminated the "other-owned auto" exclusion altogether.[88]

{¶ 125} As to defendant Westfield's argument regarding the "escape clause" in Exclusion 5.c., plaintiff first observes that the exclusion does not apply to the claims of Kathleen Johnston because she did not sustain "bodily injuries" while occupying the motorcycle.[89] Plaintiff then argues that that Exclusion 5.c. is an "escape clause" that is unenforceable under Ohio law.

Westfield's Third Argument (No UIM Coverage Under the Umbrella Section)

{¶ 126} Defendant Westfield's third argument asserts that the umbrella portion of the Westfield policy does not provide UIM coverage to the plaintiff or her decedent for two reasons: (1) neither plaintiff nor her decedent is an "insured" as that term is defined by the umbrella section of the Westfield policy, and (2) even if plaintiff or her decedent is defined as an "insured" by the umbrella section of the Westfield policy, no UIM coverage would arise because no UIM coverage is provided for plaintiff's claims under the business auto section of the Westfield policy. In support of the first reason, defendant Westfield quotes from the umbrella section of the policy which includes the following in the definition of who is an insured:

{¶ 127} "Any other person or organization which is included as an insured under the insurance listed in the Schedule of Underlying Insurance *but only insofar as coverage is afforded to that person or organization by that insurance.*" (Emphasis added).

{¶ 128} Hence, in addition to the requirement that the alleged insured be included as an insured in the underlying insurance, the alleged insured must also be afforded coverage by the underlying insurance. Citing the unreported federal

---

87. R.C. 3938.17(K)(2).

88. See 2000 S.B. No. 267, effective 9–21–2000.

89. Of course, Kathleen Johnston's claim is for the loss of her son, which resulted from the "bodily injuries" he sustained in the accident while "occupying" the motorcycle.

district court decision of *Hindall v. Winterthur International*,[90] Westfield argues that since neither plaintiff nor her decedent are covered by the business auto section of the Westfield policy, they are not "insureds" under the umbrella section. In support of this argument, defendant Westfield cites the Ohio Supreme Court decision in *Holliman v. Allstate Ins. Co. Corp.*[91] and the unreported federal district court decision in *Estate of Myers v. CNA Fin. Corp.*[92]

{¶ 129} In response, citing *Scott–Pontzer*[93] and *Selander*,[94] plaintiff argues that R.C. 3937.18(A)—as amended by H.B. 261, effective 9-3-1997[95]—required Westfield to offer UM/UIM coverage to Contour Tool, Inc. with the umbrella provisions. Plaintiff observes that Westfield did not make such an offer, and that as a result, the statute operates to read the UM/UIM coverage into the umbrella provisions of the Westfield policy.

Westfield's Fourth Argument (Umbrella is Excess
Subject to the Retained Limit)

{¶ 130} Defendant Westfield's fourth argument asserts that any UIM coverage alleged to be available under Westfield's umbrella section is only excess coverage subject to the retained limit.

---

**90.** *Hindall v. Winterthur Internatl.* (Mar. 29, 2001), N.D. Ohio No. 3:00CV7429, 2001 WL 339459. Westfield describes *Hindall* as holding that "[c]overage is precluded under an excess policy if no coverage is available pursuant to the underlying policy where the former becomes applicable only when plaintiff is entitled to coverage pursuant to the underlying policy." However, it should be noted that *Hindall's* holding with respect to the lack of UM/UIM coverage in the primary policy was based expressly on R.C. 3937.18(C) as amended by H.B. 261 (eff. 9-3-1997). On the same issue, the court also distinguished the case law relied upon by plaintiff because those cases interpreted the former (pre-H.B.261) version of the statute. And, in finding that H.B. 261 applied, the federal court incorrectly based its finding on the date of the accident, rather than the date when the policy contract began or was renewed. See *Ross v. Farmers Ins. Group* (1998), 82 Ohio St.3d 281, 695 N.E.2d 732, and *Wolfe v. Wolfe* (2000), 88 Ohio St.3d 246, 725 N.E.2d 261.

**91.** *Holliman v. Allstate Ins. Co.* (1999), 86 Ohio St.3d 414, 715 N.E.2d 532 (4–3) (Moyer, C.J., F.E. Sweeney, Cook and Lundberg Stratton, JJ.) (Douglas, Resnick and Pfeifer, JJ., dissenting) (broad policy definition of "insured" in Nationwide's primary liability policy does not apply to narrower definition of "insured" in Allstate's umbrella policy).

**92.** *Estate of Myers v. CNA Fin. Corp.* (Jan. 23, 2001), N.D. Ohio No. 5:00–CV–1759 (where "scope of employment" limitations appear in the definition of who is an insured—rather than in a separate exclusion—they apply to exclude from coverage an employee of a corporate insured who was outside the course and scope of employment when the injury occurred).

**93.** *Scott–Pontzer v. Liberty Mut. Fire Ins. Co.* (1999), 85 Ohio St.3d 660, 710 N.E.2d 1116.

**94.** *Selander v. Erie Ins. Group* (1999), 85 Ohio St.3d 541, 709 N.E.2d 1161.

**95.** As discussed elsewhere in this opinion, the application of H.B. 261 to the facts of this case is not clear because the parties have not supplied this court with evidence of the original contract date and the subsequent renewals of the policy.

{¶ 131} In response, plaintiff takes no position on the extent to which the Westfield policy is excess to coverage provided by other insurance policies in this case.

### Westfield's Fifth Argument (Case Law Violates the Contract Clause)

{¶ 132} For its fifth argument, defendant Westfield asserts that the decisions of the Ohio Supreme Court in *Selander, Scott–Pontzer, Ezawa, Wolfe,* and/or *Linko* violate the Contract Clauses in both the United States Constitution and the Ohio Constitution.

{¶ 133} In response, plaintiff argues that defendant Westfield has failed to produce evidence that any statute enacted by the Ohio General Assembly is being applied to the facts of this case retrospectively.

### Westfield's Sixth Argument (Setoff Against Tortfeasor's Other Policies)

{¶ 134} For its sixth argument, defendant Westfield asserts that, even if Westfield is liable, it is entitled to set off all limits available for payment under the tortfeasor's policy.

{¶ 135} Plaintiff offers no response to this argument.

### Westfield's Seventh Argument (Westfield's UIM Benefits are Excess and Pro Rata)

{¶ 136} For its seventh argument, defendant Westfield asserts that, even if Westfield is liable, it is liable on a pro rata basis only to the extent that its UIM limits exceed the primary coverage available to plaintiff under other insurance.

{¶ 137} Plaintiff offers no response to this argument.

### ii. Conclusions of Law

{¶ 138} Construing the evidence most strongly in favor of the party against whom the respective motions were made, the court concludes as follows:

{¶ 139} 1. Defendant Westfield's motion to dismiss (due to plaintiff's alleged failure to join necessary parties) is without merit because plaintiff has joined all necessary parties through its first amended complaint. Therefore, this court has jurisdiction to decide whether plaintiff is entitled to declaratory judgment and the motion to dismiss is denied.

{¶ 140} 2. Neither the plaintiff nor defendant Westfield has provided this court with a factual foundation on which to decide what version of R.C. 3937.18 applies to the Westfield policy. Specifically, in the absence of the evidence of the initial contracting date, it is unclear whether the amendments enacted by H.B. 261 (eff. 9-3-1997) apply to the Westfield policy.[96]

---

96. Since the policy attached to the pleadings is a copy of a "renewal" for the one-year period commencing on October 27, 1998, it seem plausible to suppose that the latest date on which

{¶ 141} However, with respect to the "other-owned auto" exclusion, plaintiff has demonstrated that, regardless of which version of the statute applies, this exclusion would not apply to the facts of this case. The "other-owned auto" exclusion is either invalid under *Martin v. Midwestern Group Ins. Co.*, or else it is valid under the H.B. 261 provisions, but applies only to Contour Tool, Inc. as the "named insured."

{¶ 142} With respect to the "escape clause" in Exclusion 5.c., if the Westfield contract period began *prior* to the effective date of S.B. 20 (eff. 10-20-1994), then this issue is governed by *Savoie v. Grange Mut. Ins. Co.*,[97] and in that event, *Savoie* holds that such an "escape clause" is unenforceable.[98] If, however, the Westfield contract period began *after* the effective date of S.B. 20, then this issue is governed by S.B. 20, and in that event, the "escape clause" may bar coverage under the Westfield policy.[99]

{¶ 143} As noted above, although the parties have supplied the court with a certified copy of the 10–27–1998 "renewal" of the policy, neither party has supplied the court with any evidence regarding when the Westfield contract period began. Nevertheless, in light of the statutorily mandated two-year

---

the original contracting date may have occurred was October 27, 1997. If this is the original contracting date, then the mandatory two-year policy period would include the amendments enacted by H.B. 261, effective September 3, 1997. Similarly, if the original contracting date was October 27, 1996, then the mandatory two-year period would have expired on October 27, 1998—the date of the renewal policy attached to the pleadings. In that instance, the renewal policy would have initiated a new mandatory two-year policy period that would have included the amendments enacted by H.B. 261. But each of these scenarios assumes that there was no interruption of Westfield's coverage by lapse, change of insurance carriers, or otherwise, and that every previous renewal was for a one-year period.

**97.** *Savoie v. Grange Mut. Ins. Co.* (1993), 67 Ohio St.3d 500, 620 N.E.2d 809.

**98.** *Doran v. Allstate Ins. Co.* (Dec. 10, 1999), 11th Dist. No. 98–L–106, 1999 WL 1313638 (In a policy purchased prior to the effective date of S.B. 20, the excess provision in the uninsured/underinsured portion of the policy was unenforceable under *Savoie*), expressly overruling *Hancock v. Motorists Ins. Co.* (Mar. 24, 1995), 11th Dist. No. 93–T–4915, 1995 WL 237084, which had erroneously held that *Savoie* was limited to antistacking issues and did not apply to exclusionary clauses.

**99.** {¶ a} Under *State Farm Mut. Auto. Ins. Co. v. Home Indemn. Ins. Co.* (1970), 23 Ohio St.2d 45, 52 O.O.2d 170, 261 N.E.2d 128, the general rule provides that—in cases involving two applicable insurance policies—where one policy contains an excess clause and the other policy contains an escape clause, the excess clause is given effect, and the policy containing the escape clause is held to provide the primary coverage.

{¶ b} But, see, *Monroe Guar. Ins. Co. v. Hartford Steam Boiler Inspection & Ins. Co.* (Mar. 31, 2000), 11th Dist. No. 98–T–0135, 2000 WL 522326, holding that the general rule—that an excess clause will be given effect when it conflicts with an escape clause—does not apply to cases involving two insurance policies where (1) each policy contains an excess clause, but neither policy contains an escape clause, and (2) at least one of the policies would deny coverage even if the "other insurance" language were not in the respective policies.

minimum policy period, it is apparent to the court that the Westfield contract period began no earlier than 10–27–1995.[100] Therefore, the provisions of S.B. 20 apply to the Westfield policy and the "escape clause" is enforceable.[101]

{¶ 144} The next question is whether the escape clause properly applies to the claims of the plaintiff and her decedent under the Westfield policy. As defendant Westfield points out, the case law cited by plaintiff[102] arose in the special circumstance involving two insurance policies, where one policy contains an escape clause and the other policy contains an excess clause. The centerpiece of the reasoning in that line of cases is that if the court allows the escape clause in one policy to apply without regard for the combined effect of the excess clause in the other policy, the injured claimant would have no coverage at all.[103] The present case involves a very different situation. Here, as discussed above, the policies provided by defendant Cincinnati provide coverage to plaintiff and her decedent. Furthermore, notwithstanding this court's denial of plaintiff's motion for summary judgment pertaining to the Allstate policy, plaintiff may yet be able to provide this court with evidence at trial to show exactly when the two-year contract period for the Allstate policy began, and it is, therefore, possible that plaintiff may be able to show that the Allstate policy also provides coverage.

---

**100.** {¶ a} The court reaches this conclusion by working backwards from the renewal date of 10–27–1998. The original contract period could have begun as late as 10–27–1997, in which case the policy is governed by S.B. 20. If the original contract period began on 10–27–1996, then the two-year policy period began with the renewal on 10–27–1998. If the original contract period began on 10–27–1995, then the two-year period began again when the policy was renewed on 10–27–1997. If the original contract period began prior to 10–27–1995, then one of the post-S.B. 20 renewals would have started a new two-year period.

{¶ b} The alternative to this analysis is to simply not decide the issue due to the lack of direct evidence regarding the commencement of the contract period. Should the parties wish to illuminate the court prior to final judgment in this case, they are, of course, free to do so.

**101.** None of the insurance companies that are parties to this case has argued the issues regarding allocation of their respective liabilities. Accordingly, the court declines to rule on those issues until they have been briefed by the parties.

**102.** *Bowerman v. State Farm Ins. Co.* (Sept. 30, 1996), 6th Dist. No. F–95–019, 1996 WL 549207 (State Farm policy contained excess clause while Nationwide policy contained escape clause); *State Farm Ins. Co. v. Home Indemn. Co.* (1970), 23 Ohio St.2d 45, 52 O.O.2d 170, 261 N.E.2d 128 (State Farm policy contained excess clause while Home Indemnity policy contained escape clause); *State Farm Mut. Auto. Ins. Co. v. Nationwide Mut. Ins. Co.* (May 24, 1995), 2d Dist. No. 14787, 1995 WL 434076 (State Farm policy contained excess clause while Nationwide policy contained "super escape" clause); *Hartford Acc. & Indemn. v. Allstate Ins. Co.* (Dec. 16, 1983), 11th Dist. No. 3193, 1983 WL 6019 (rule in *State Farm Ins. Co. v. Home Indemnity Ins. Co.* does not apply where Hartford policy contained excess clause but Allstate policy did not contain escape clause).

**103.** "It is also patent that if all the provisions of each policy are to be given full effect, without reference to the other, neither policy would cover the loss." *State Farm Ins. Co. v. Home Indemn. Ins. Co.* (1970), 23 Ohio St.2d 45, 46, 52 O.O.2d 170, 261 N.E.2d 128.

Accordingly, for the purpose of ruling on plaintiff's motion for summary judgment pertaining to the liability provisions of the Westfield policy, the court finds that plaintiff has failed to prove that the enforcement of Westfield's escape clause will necessarily deprive plaintiff of all other insurance coverage; therefore, the case law cited by plaintiff does not apply to these facts. By its terms, the escape clause in 5.c. states:

{¶ 145} "C. Exclusions

{¶ 146} "This insurance does not apply to:

{¶ 147} "* * *

{¶ 148} "5. 'Bodily injury' sustained by:

{¶ 149} " * * *

{¶ 150} "c. Any 'family member' while 'occupying' or when struck by any vehicle owned by you that is insured for Uninsured Motorists Coverage on a primary basis under any other Coverage Form or policy."

{¶ 151} In the present case, the Westfield policy insures Contour Tool, Inc. as the named insured. Under the standard *Scott–Pontzer* ambiguity analysis, the word "You" in the "Who is an insured" section of the UM/UIM endorsement includes Contour Tool, Inc.'s individual employees as insureds. Plaintiff's claims under the Westfield policy arise only if the "You" in the "Who is an insured" section refers to Daniel Johnston. The policy language also includes "any family member" as an insured, but it does so only when "You" refers to an individual—which in this case would be the individual employee, Daniel Johnston. When "You" refers to Contour Tool, Inc., the policy language does not include "any family member" as an insured because Contour Tool, Inc. is not an individual. Accordingly, the "you" in the phrase "owned by you" in Exclusion 5.c. can only refer to Daniel Johnston. Daniel Johnston co-owned the motorcycle. David Johnston was a family member who was occupying the motorcycle when he incurred the bodily injuries. And the motorcycle was insured for uninsured motorists coverage on a primary basis by the Progressive policy, the Cincinnati policies, and possibly by the Allstate policy. Therefore, the claims of David Johnston under the liability provisions of the Westfield policy are barred by Exclusion 5.c. in the policy. Similarly, since the claims of Kathleen Johnston for the loss of her son are based on bodily injury sustained by a family member (David Johnston) while he was occupying a vehicle owned by Daniel Johnston that was insured for uninsured motorists coverage on a primary basis under other policies, the claims of Kathleen Johnston under the liability provisions of the Westfield policy are also barred by Exclusion 5.c. in the policy.

{¶ 152} 3. With respect to Westfield's third argument, the Westfield umbrella provisions define who is an insured as follows:

{¶ 153} "Section II—Who is an insured

{¶ 154} "* * *

{¶ 155} "3. Each of the following is also an insured:

{¶ 156} "* * *

{¶ 157} "b. Any other person or organization which is included as an insured under the insurance listed in the Schedule of Underlying Insurance but only insofar as coverage is afforded to that person or organization by that insurance."

{¶ 158} As discussed above, under *Scott–Pontzer*, defendant Daniel Johnston was an insured under the "Who is an insured" definition in the business auto section of the Westfield policy. Since Daniel Johnston was an insured under the term "You," both plaintiff and plaintiff's decedent were insureds as "any family member" of the individual "You." However, as discussed above, the claims of plaintiff and her decedent were excluded under Exclusion 5.c. of the business auto section of the Westfield policy. Therefore, although plaintiff and her decedent were insureds under the business auto section, coverage was not afforded to either of them by that insurance.[104] Accordingly, neither plaintiff nor her decedent was an insured as that term is defined in Section II 3.b. of the umbrella section of the Westfield policy.

{¶ 159} Plaintiff's argument based on *Selander*[105] is misplaced. In *Selander*, there was no question regarding whether the claimants were "insureds" under the definitional terms of the policy. The plaintiff's decedent in that case was a member of a partnership and was injured while occupying an automobile listed on the partnership's general business liability policy as a covered automobile. The central question in *Selander* was not whether the claimants came within the policy terms defining who was an insured. Rather, the central question was whether the general business liability policy—which admittedly defined the claimants as insureds—provided automobile liability coverage such that R.C. 3937.18(A) required the issuer of the policy to provide UM/UIM coverage. Similarly, plaintiff's reliance on *Scott–Pontzer*[106] is also misplaced. In finding

---

**104.** *Holliman v. Allstate Ins. Co.* (1999), 86 Ohio St.3d 414, 715 N.E.2d 532 (4–3) (Moyer, C.J., F.E. Sweeney, Cook and Lundberg Stratton, JJ.) (Douglas, Resnick and Pfeifer, JJ., dissenting), cited by *Commercial Intertech Corp. v. Guyan Internatl., Inc.* (Mar. 30, 2001), 11th Dist. No. 99–P–0119, 2001 WL 314869 ("[W]hen the language is clear and unambiguous, a court cannot resort to construction of the language.").

**105.** *Selander v. Erie Ins. Group* (1999), 85 Ohio St.3d 541, 709 N.E.2d 1161.

**106.** *Scott–Pontzer v. Liberty Mut. Fire Ins. Co.* (1999), 85 Ohio St.3d 660, 710 N.E.2d 1116.

UM/UIM coverage implied by law, the *Scott–Pontzer* court expressly premised its conclusion on its finding that the plaintiff fell within the definition of "insured" in the policy. Only after finding that the plaintiff fell within that definition did the court conclude that the exclusionary language elsewhere in the policy pertained solely to liability coverage and not to UM/UIM coverage implied by law. The current case presents the opposite set of facts. Here, the claimants fall outside of the clear and unambiguous definition of "who is an insured" that appears in the umbrella portion of the Westfield policy. That being the case, the court's analysis ends there.[107]

{¶ 160} 4. Since this court has found that there is no coverage under either the liability or the umbrella provisions of the Westfield policy, defendant Westfield's fourth argument—regarding the alleged effect of the retained limit—is moot.

{¶ 161} 5. The court finds that defendant Westfield's constitutional arguments are not well taken. Neither of the constitutional Contract Clauses[108] cited by defendant Westfield applies to judicial pronouncements, regardless of whether such pronouncements can be characterized as "judicial legislation." The Contract Clauses apply to enactments of the legislative branch; they do not apply to judicial opinions.

{¶ 162} 6. Since this court has found that there is no coverage under either the liability or the umbrella provisions of the Westfield policy, defendant Westfield's sixth argument—regarding an alleged setoff of the limits available for payment under the tortfeasor's policy—is moot.

{¶ 163} 7. Since this court has found that there is no coverage under either the liability or the umbrella provisions of the Westfield policy, defendant Westfield's seventh argument—regarding an alleged pro rata payment of UIM benefits—is moot.

---

**107.** *Scott–Pontzer v. Liberty Mut. Fire Ins. Co.* (1999), 85 Ohio St.3d 660, 710 N.E.2d 1116; *Lawler v. Fireman's Fund Ins. Co.* (Aug. 28, 2001), N.D.Ohio No. 101CV503, 2001 WL 1078381.

**108.** {¶ a} The Ohio Constitution provides, in Section 28, Article II, governing retroactive laws, as follows: "The general assembly shall have no power to pass retroactive laws, or laws impairing the obligation of contracts; but may, by general laws, authorize courts to carry into effect, upon such terms as shall be just and equitable, the manifest intention of parties, and officers, by curing omissions, defects, and errors, in instruments and proceedings, arising out of their want of conformity with the laws of this state."

 {¶ b} The United States Constitution provides, in Section 10, Article I: "No State shall * * * pass any * * * Law impairing the Obligation of Contracts[.]"

### Defendant Osterland's Motion for Summary Judgment

#### i. Arguments of the Parties

{¶ 164} Defendant Osterland argues that it is entitled to judgment as a matter of law on plaintiff's survival claim because plaintiff allegedly cannot meet her burden of proof to show that her decedent, David Johnston, experienced conscious pain and suffering following the accident. Specifically, defendant Osterland argues that plaintiff has failed to produce any evidence that David Johnston was conscious at any time following the motor vehicle accident. The only evidence that plaintiff has supplied on this issue is the deposition testimony of defendant Daniel Johnston. At the deposition, the following relevant exchange took place:

{¶ 165} "Q. I understand. I don't want to get into details about after the accident, but I do have to ask you one question. Was your son ever conscious to your knowledge at any time after you got to him?

{¶ 166} "A. I don't know if he was conscious or not. I know he was—when I saw him, he was laying [sic] on the pavement. There was blood coming out of everywhere. I crawled over to him. The accident report shows me laying [sic] in a 90 angle to him, but that's not where I landed. I crawled over to him, seeing his condition, and I elevated his head to try to keep his airway open, and he appeared to be in pain and trying to breathe and hurting, but he—I don't know if he was really conscious or not.

{¶ 167} "Q. He could speak?

{¶ 168} "A. No. He was gurgling and trying to make sounds, but I didn't perceive it as speech." (Deposition of Daniel Johnston, at 51–52.)

{¶ 169} In light of the foregoing testimony, defendant Osterland makes two arguments. First, defendant argues that the testimony fails to demonstrate that David Johnston suffered any conscious pain and suffering prior to death.[109] Second, defendant argues that expert testimony is required to show that David Johnston was conscious and aware of the pain and suffering caused by the injury.[110]

{¶ 170} In response, plaintiff refers to the same deposition testimony and argues first that the testimony itself creates a genuine issue of material fact regarding whether David Johnston was experiencing pain and suffering. Second,

---

**109.** Defendant cites the following cases in support of this argument: *Laverick v. Children's Hosp. Med. Ctr. of Akron* (1988), 43 Ohio App.3d 201, 202, 540 N.E.2d 305; *Flory v. New York Cent. RR. Co.* (1959), 170 Ohio St. 185, 189, 10 O.O.2d 126, 163 N.E.2d 902.

**110.** In support of its expert witness argument, defendant cites *Harris v. Mt. Sinai Med. Ctr.* (May 28, 1998), 8th Dist. No. 72668, 1998 WL 274507.

plaintiff argues that expert witness testimony is not required in all cases to establish conscious pain and suffering.[111]

### ii. Conclusions of Law

{¶ 171} Under Ohio law, a decedent may not recover for pain and suffering when it is shown that the decedent was rendered unconscious at the instant of the injury and died of such injuries without ever having regained consciousness.[112] However, one may recover for the pain and suffering endured when there is affirmative evidence to show that the decedent was not completely unconscious during the interval between the injury and death.[113] For instance, where an eyewitness testifies that subsequent to the injury and prior to the death, the witness called to the decedent but the decedent made no sound and the witness could discern no movement on the part of the decedent, summary judgment is properly granted in favor of the defendant on the survival claim.[114] However, where there is conflicting evidence in the record regarding whether the decedent regained consciousness from the time she sustained the injury to the time she expired, summary judgment is properly denied.[115]

{¶ 172} In the present case, the deposition testimony of Daniel Johnston presents conflicting evidence regarding whether plaintiff's decedent was com-

---

111. In support of its expert witness argument, plaintiff cites *Turner v. Barrett* (1980), 68 Ohio App.2d 80, 22 O.O.3d 74, 426 N.E.2d 1193 (Moyer, J.) ("Expert medical testimony is not required in every case to determine the extent of a person's injuries and pain and suffering; hence, a layman may testify regarding his pain and suffering where the damages are not so great as to require expert testimony."); and *Reeder v. Suggs* (June 29, 1982), 3d Dist. No. 1–81–46, 1982 WL 6822.

112. *Lorain Times–Herald Co. v. Del Boccio* (App.1933), 15 Ohio Law Abs. 735, 1933 WL 2253; *Laverick v. Children's Hosp. Med. Ctr. of Akron, Inc.* (1988), 43 Ohio App.3d 201, 540 N.E.2d 305.

113. *Flory v. New York Cent. RR. Co.* (1959), 170 Ohio St. 185, 189, 10 O.O.2d 126, 163 N.E.2d 902, 905; *Laverick v. Children's Hosp. Med. Ctr. of Akron, Inc.* (1988), 43 Ohio App.3d 201, 540 N.E.2d 305.

114. *Clark v. McCollum* (May 28, 1993), 6th Dist. No. L–92–158, 1993 WL 380115; see *Monnin v. Fifth Third Bank of Miami Valley* (1995), 103 Ohio App.3d 213, 658 N.E.2d 1140 (victim of gunshot wound to head died instantaneously, precluding survival action); *Harris v. Mt. Sinai Med. Ctr.* (May 28, 1998), 8th Dist. No. 72668, 1998 WL 274507 (survival action was properly barred by directed verdict where sole evidence that severely asphyxiated newborn infant ever gained consciousness was father's testimony that he saw the baby shake and that he "felt" that the baby responded when he held him).

115. *McGill v. Newark Surgery Ctr.* (2001), 113 Ohio Misc.2d 21, 756 N.E.2d 762 (medical records showed boxes checked "awake" and "responsive" upon arrival at the hospital, but the word "error" was written next to these entries; testimony also established that the anesthetic used during the surgery was turned off and on once the decedent started to bleed).

pletely unconscious during the interval between the injury and death. In favor of defendant Osterland, the testimony contains the following remarks:

{¶ 173} "A. I don't know if he was conscious or not. * * *

{¶ 174} "Q. He could speak?

{¶ 175} "A. No. * * * but he—I don't know if he was really conscious or not."

{¶ 176} In contrast, and in favor of the plaintiff, the testimony also contains the following remarks:

{¶ 177} "A. * * * and he appeared to be in pain and trying to breathe and hurting. * * *"

{¶ 178} "A. * * * He was gurgling and trying to make sounds[.]"

{¶ 179} Construing the conflicting evidence most strongly in favor of the party against whom the motion for summary judgment has been made, the court concludes that there is a genuine issue of material fact such that reasonable minds could come to more than one conclusion regarding whether plaintiff's decedent was unconscious from the instant the injury occurred until his death. Expert testimony is not required for a laymen to testify that a 17-year-old young man who has just fallen from a motorcycle without a helmet and whose head has just hit the pavement "appeared to be in pain * * * and hurting."[116] Additionally, when an eyewitness testifies that the injured victim was "trying to make sounds," that testimony establishes a level of volition on the part of the victim that is consistent with consciousness. Therefore, defendant Osterland's motion for summary judgment is hereby denied.

## RULINGS

{¶ 180} Accordingly, for the foregoing reasons, the court hereby rules as follows:

{¶ 181} 1. Plaintiff's partial motion for summary judgment against defendant Allstate is denied.

{¶ 182} 2. Defendant Allstate never filed a motion for summary judgment.

{¶ 183} 3. Defendant Cincinnati's partial motion for summary judgment against plaintiff is denied, and plaintiff's partial motion for summary judgment against defendant Cincinnati is granted. Accordingly, the court declares that plaintiff and her decedent are insureds entitled to UIM coverage under the Cincinnati policies, and that the UIM policy limits are $1,000,000 on the primary

---

116. *Turner v. Barrett* (1980), 68 Ohio App.2d 80, 22 O.O.3d 74, 426 N.E.2d 1193 (Moyer, J.).

Cincinnati policy (Policy No. 0638871) and $5,000,000 on the Cincinnati umbrella policy (Policy No. CCC 438115).

{¶ 184} 4. Plaintiff's partial motion for summary judgment against defendant Westfield is denied, defendant Westfield's motion to dismiss is denied, and defendant Westfield's partial motion for summary judgment is granted. Accordingly, the court declares that although plaintiff and her decedent were "insureds" under the definition of "Who is an insured" in the business auto section of the Westfield policy, their respective claims are excluded from coverage by the escape clause in Section 5.c. of the Westfield policy. Under the umbrella section of the Westfield policy, the court declares that neither plaintiff nor her decedent fall within the definition of "Who is an insured." Therefore, neither plaintiff nor her decedent is covered by the umbrella portion of the Westfield policy.

{¶ 185} 5. Defendant Osterland's motion for summary judgment is denied.

{¶ 186} IT IS SO ORDERED.

Judgment accordingly.